[Cite as *State v. Merriweather*, 2017-Ohio-421.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-04-077 |
| | : | O P I N I O N |
| - vs - | | 2/6/2017 |
| | : | |
| DEMARKO J. MERRIWEATHER, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2015-05-0679


Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Scott N. Blauvelt, 315 South Monument Avenue, Hamilton, Ohio 45011, for defendant-appellant


**PIPER, J.**

{¶ 1} Defendant-appellant, Demarko Merriweather, appeals his convictions and sentence in the Butler County Court of Common Pleas for murder, felonious assault, and accompanying firearm specifications.

{¶ 2} In March 2015, Merriweather went to Wise Guys Bar and Grill in Fairfield, Ohio with friends and family to celebrate the birthday of his younger sister, Rodquisha Black. That

night, Merriweather wore light colored stone-washed jeans, white shoes, and a white hooded shirt, which contained a brand name, Michael Kors, emblem on the front. Merriweather also wore a white tank top or "wife beater" underneath his Michael Kors shirt.

{¶ 3} In the bar, a disagreement ensued between Black and another woman when the two females bumped into one another. The disagreement escalated to a physical altercation and a further exchange of heated words. Eventually, both parties were ejected from the bar.

{¶ 4} After ejection from the bar, fighting continued in the parking lot. Merriweather and other members of his party began beating Vincent Brown, who was a member of the other woman's party. Christopher Crockett fired a shot from his gun and hit Black in her arm. Merriweather then took a gun from a member of his party and fired several times at Crockett, missing each time. After a short time, Merriweather removed his Michael Kors shirt and held it in his hand. Merriweather then walked up to Brown and shot him in the face and chest. Brown died almost instantly from his wounds.

{¶ 5} Merriweather fled Wise Guys and tried to take Black to a hospital. However, he encountered police before he was able to reach a hospital. Police called an ambulance, and Black was transported to the hospital where she survived her injuries. Merriweather and his other passenger were taken to the police station and questioned about the shooting. Merriweather denied ever having a gun or shooting a gun that night, and police tested Merriweather's hands and clothing for gunshot residue.

{¶ 6} Several weeks later, Merriweather was charged with Brown's murder, as well as with felonious assault for shooting at Crockett. Merriweather pled not guilty to the charges, and the matter proceeded to a jury trial. The state presented several witnesses who identified Merriweather as the shooter based on the clothing he was wearing on the night of the incident. The state also presented evidence that Merriweather tested positive for gunshot

residue on the night Brown was murdered.

{¶ 7}   Merriweather testified in his own defense, and claimed that he never shot at anyone on the night of the incident.  Instead, Merriweather claimed that he only fired a gun in the air after his sister was shot, in an attempt to scare people away from his family.  In so claiming, Merriweather admitted to lying to police on the night of the incident, and admitted that he did not contact police during the many weeks before he was charged for the crimes, to tell investigators that he had actually fired a gun that night.

{¶ 8}   The jury found Merriweather guilty of murder and felonious assault, as well as the accompanying firearm specifications.  The trial court sentenced Merriweather to 15 years to life in prison for the murder, four years for the felonious assault, which the trial court classified as a mandatory sentence, and three years for each of the firearm specifications. The trial court ran the sentences consecutively, for an aggregate base sentence of 25 years. Merriweather now appeals his convictions and sentence, raising the following assignments of error.  For ease of discussion, and because they are interrelated, we will address Merriweather's first and second assignments of error together.

{¶ 9}   Assignment of Error No. 1:

{¶ 10}   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR MURDER IN COUNT ONE, AND THE VERDICT ON THIS COUNT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 11}   Assignment of Error No. 2:

{¶ 12}   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR FELONIOUS ASSAULT IN COUNT TWO, AND THE VERDICT ON THIS COUNT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 13}   Merriweather argues in his first two assignments of error that his convictions were not supported by sufficient evidence, and were otherwise against the manifest weight of

the evidence.

{¶ 14} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 15} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 16} "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide." *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 17} Although the legal concepts of sufficiency of the evidence and weight of the

evidence are both quantitatively and qualitatively different, a "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 18} Merriweather was convicted of murder and felonious assault. According to R.C. 2903.02(A), "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." According to R.C. 2903.11(A)(2), no personal shall "Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶ 19} During trial, the state presented evidence that Merriweather committed murder when he shot and killed Vincent Brown, and that Merriweather committed felonious assault when he shot at Christopher Crockett. The state presented testimony from several witnesses who were at Wise Guys on the night of the incident, as well as testimony from officers regarding the investigation that led to Merriweather's arrest.

{¶ 20} A police sergeant testified that she was the supervisor of road patrol and was on duty the night Brown was killed. The sergeant testified that she received a dispatch that a fight had broken out at Wise Guys, and that she responded to the bar within four minutes of the dispatch. The sergeant found a deceased Brown laying on the parking lot with a gunshot wound to his face and to his chest area.

{¶ 21} The state next presented testimony from the head of security for Wise Guys. The employee testified that he was working at the bar on the night of the incident, and that during his shift, he was informed that the two parties had begun fighting inside the bar. The employee testified that he and other security employees ejected the members of both parties, and that the members of both parties continued to yell at each other outside of the bar. The employee also testified that soon after ejecting the parties, he was forced to break up a physical fight when three to four men from Black's party began beating Vincent Brown.

{¶ 22} The employee described breaking up the fight, picking up Brown from the pavement, and standing Brown against a car to steady him. The employee then testified that out of his peripheral vision, he saw a man in white clothing, including a white tank top or "wife beater" come upon them and shoot Brown twice. The employee testified that he ran back into the bar once the shots were fired. When asked by the state if the employee had seen the shooter before, the employee testified that the shooter had been the same man who had worn the Michael Kors shirt earlier in the evening.

{¶ 23} The state also presented testimony from a man who came to the bar that night with his cousin. Before entering the bar, the man and his cousin sat in the car smoking marijuana. Before the two finished their marijuana, the members of both parties were ejected from the bar, and the man and his cousin observed the fighting continue and escalate into the shooting. The man testified that he saw a man wearing a white shirt with an emblem on the front shoot several times.

{¶ 24} A female patron of the bar also testified for the state, and described being at the bar that night with her sister and other female friends. When the parties were ejected from the bar, she and her sister left, and walked toward where she had parked her car. The woman, who knew Brown personally, watched as a man walked up to Brown and shot him in the face. The woman described the shooter as having a white shirt. The woman then ran towards Brown and saw that he had a gunshot wound in his cheek and that blood was coming from his mouth. The woman testified that she knew that Brown had died by the time she reached his side.

{¶ 25} Another female patron testified that she and the people she was with exited the bar shortly before the two parties were ejected. As the female waited for her friends to enter her car, she observed the fighting between the two parties and heard gunshots. The female patron testified that she was initially unable to leave the parking lot because she was

still waiting on one friend to enter her car, and she was afraid of hitting someone in the parking lot. The female patron testified that she observed two men walk past her car, one carrying a gun. The female patron testified that the man carrying the gun was wearing white. Police later searched the female's car and located Merriweather's handprint on the hood of the car.

{¶ 26} The state also called an agent who performed a gunshot residue test on Merriweather on the night of the incident. After the police encountered Merriweather, Black was transported to the hospital while Merriweather and his other passenger were taken to the police station for questioning. There, Merriweather's clothing and cellular phone were collected as evidence, and the agent performed a gunshot residue test on Merriweather's hands. The test was later analyzed by the Bureau of Criminal Investigations, and indicated that both of Merriweather's hands "had particles that are highly indicative of gunshot primer residue." Some of Merriweather's clothing also tested positive for gunshot residue.

{¶ 27} The state also presented testimony from a mobile forensic examiner and analyst, who testified that he performed an analysis of Merriweather's phone after Merriweather was taken to the police station on the night of the incident. The analyst was able to download several pictures from Merriweather's phone, including one showing him dressed on the night of the incident in the white shirt with a Michael Kors logo.

{¶ 28} The state then presented testimony from a detective who viewed the surveillance videos from Wise Guys' security cameras specific to the night Brown was killed. The detective testified that she viewed the videos multiple times for the purpose of identifying the bar patrons and determining who was involved in the fighting and gunfire. The detective testified that Merriweather was the only patron that night to have on a white shirt with the Michael Kors logo, and that the video depicted Merriweather before and after he took off his Michael Kors shirt. The video also depicted Merriweather holding his Michael Kors shirt in

one hand, and a gun in the other before walking up to Brown and shooting him in the face and chest.

{¶ 29} During cross-examination, the detective testified that she viewed footage of Merriweather in the bar where he removed his Michael Kors shirt, and that he was wearing a white tank top or wife beater. The detective also testified that she viewed footage of Merriweather putting his Michael Kors shirt back on before the altercation began that led to ejection from the bar.

{¶ 30} In support of his defense, Merriweather called his sister, Rodquisha Black. Black explained that the disagreement that night started when the other woman bumped into her at the bar. The two women exchanged heated words, and the other woman threw her shoe at Black. The two groups exchanged words and the altercation began, at which point, the two groups were ejected from the bar. Black testified that there were approximately 30 people in the parking lot, and that there was a "commotion going on." As Black looked for her family, she was shot in the arm. Black testified that Merriweather grabbed her in protection and that she later ran to her friend's car as she continued to hear gunfire. Black testified that she did not see Merriweather fire any shots, but also testified that she reached the car, got in, was feeling woozy, and closed her eyes, all before her brother got into the car with her.

{¶ 31} Merriweather testified in his own defense and denied shooting Brown. Merriweather testified that after the parties were ejected from the bar, the fighting continued in the parking lot. Merriweather learned that his sister had been shot and grabbed her to defend her. Merriweather testified that at that point, he picked up a gun from the ground and fired into the air. Merriweather testified that another member of his party continued to fire a gun, and that he tried to stop the gunfire because his mother was in the area. Merriweather asserted that he went toward his mother and brother, and eventually ran to the car.

Merriweather confirmed that at the time of the events, he had taken off his Michael Kors shirt, but testified that he "absolutely did not shoot Vincent Brown" or shoot at Christopher Crockett.

{¶ 32} While the jury heard extensive and sometimes contradictory evidence, we reiterate that the jury was in the best position to judge the credibility of the testimony offered at trial, especially that of Merriweather when he testified that he did not kill Brown or shoot at Crockett. "Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound [principle] that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence." *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 41.

{¶ 33} When the evidence is viewed in a light most favorable to the prosecution, we find that the jury could reasonably have found beyond a reasonable doubt that Merriweather committed murder and felonious assault. Several witnesses identified Merriweather as the shooter given the distinct clothing he was wearing on the night of the incident, and the jury heard evidence that Merriweather tested positive for gunshot residue on his hands and some clothing. The jury also saw the surveillance video several times. As such, we cannot say that after resolving the conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that Merriweather's convictions must be reversed and a new trial ordered. Merriweather's first and second assignments of error are therefore overruled.

{¶ 34} Assignment of Error No. 3:

{¶ 35} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN ADMITTING IRRELEVANT AND INFLAMMATORY PHOTOGRAPHS AT TRIAL.

{¶ 36} Merriweather argues in his third assignment of error that the trial court erred in admitting photographs into evidence.

{¶ 37} An appellate court will not reverse a trial court's decision regarding the admission of evidence absent an abuse of discretion. *State v. Lamb*, 12th Dist. Butler Nos. CA2002-07-171 and CA2002-08-192, 2003-Ohio-3870, ¶ 59. An abuse of discretion is more than an error of law or judgment, and instead implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Thompson*, 12th Dist. Warren No. CA2015-09-083, 2016-Ohio-2895, ¶ 8.

{¶ 38} According to Evid.R. 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even if evidence is relevant, it may nonetheless be excluded if the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 39} Merriweather argues that two photographs taken by and later downloaded from his phone camera were improperly admitted over objection at trial. The two photographs were taken of Merriweather at times other than the night of the incident. As such, Merriweather argues that the photographs were irrelevant, and otherwise prejudicial to him. Specifically, the first picture shows Merriweather with another man who was also present at the bar on the night of the incident. The second picture shows four men, one of which was Merriweather, posing with their hands in a gesture that appears to depict a firearm.

{¶ 40} Despite Merriweather's arguments, the trial court did not abuse its discretion in admitting the two photographs. Merriweather was a subject in both of the photographs, thus helping the jury to connect Merriweather to the contents of the phone. Also, the photographs helped the jury see that Merriweather was associated with other people who were also at the bar on the night of the incident and that Merriweather had an ongoing relationship with them. Specifically, another man in the photographs was Rafael Knight, who was also seen with the

gun on the night of the shooting. Thus, the photographs contained probative evidence of Merriweather and Knight's ongoing relationship and would allow the jury to see how the two could share a firearm on the night of the incident.

{¶ 41} Moreover, the photographs were not prejudicial to Merriweather where they simply depicted Merriweather socializing with others. While the one photograph does depict Merriweather and three others holding their fingers in the shape of a gun, Merriweather never claimed to the jury that he was unfamiliar with guns or had any aversion to weapons. In fact, Merriweather admitted during his testimony that he picked up a gun and shot it in the air, thus showing a level of comfort and familiarity with a gun. As such, any slight prejudicial value the photograph may have had because of the way in which the men were holding their fingers was clearly outweighed by the probative value of the photograph. As such, the trial court properly admitted the photographs, and Merriweather's third assignment of error is overruled.

{¶ 42} Assignment of Error No. 4:

{¶ 43} THE STATE OF OHIO ENGAGED IN PROSECUTORIAL MISCONDUCT AT TRIAL.

{¶ 44} Merriweather argues in his fourth assignment of error that the state engaged in several instances of prosecutorial misconduct during his trial.

{¶ 45} For a conviction to be reversed on the basis of prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. To demonstrate prejudice, a defendant must show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred. *State v. Jones*, 12th Dist. Butler No. CA2006-11-298, 2008-Ohio-865, ¶ 21.

{¶ 46} The focus of "an inquiry into allegations of prosecutorial misconduct is upon

the fairness of the trial, not upon culpability of the prosecutor." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. As such, prosecutorial misconduct "is not grounds for error unless the defendant has been denied a fair trial." *State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 27.

{¶ 47} Crim.R. 52(B) provides that plain errors "or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error means an obvious defect in trial proceedings that affected the defendant's substantial rights. *State v. Knodel*, 12th Dist. Butler No. CA2006-06-156, 2007-Ohio-4536, ¶ 15. Notice of plain error is taken with the utmost caution, under exception circumstances, and only to prevent a manifest miscarriage of justice. *State v. Grisham*, 12th Dist. Warren No. CA2013-12-118, 2014-Ohio-3558, ¶ 38.

{¶ 48} Merriweather first argues that the state engaged in prosecutorial misconduct in its opening statement by addressing the fact that he was indicted for the crimes by the grand jury. Merriweather did not object to the reference, and thus has waived all but plain error. During the state's opening statement, the prosecutor referenced the security video, and stated, "it's hard to see. So you have to be patient and we ask you to be patient with it to review the video like we have. But, at the end of the day, ladies and gentlemen, the Butler County grand jury has reviewed this case, reviewed the evidence and they have charged this Defendant with two felony counts."

{¶ 49} While we agree with Merriweather that the statement was an improper reference to the grand jury's decision to indict, the impropriety of the reference does not rise to the level of plain error. Instead, the trial court very specifically informed the jury in its instructions, "the criminal case begins with the filing on [sic] an indictment. An indictment informs the Defendant that they have been charged with an a [sic] crime. The fact that it was filed may not be considered for any purpose." Moreover, the jury was told that opening and

- 12 -

closing arguments were not evidence, and we presume that the jury followed and complied with instructions given to them by the trial court. *State v. Shouse*, 12th Dist. Brown No. CA2013-11-014, 2014-Ohio-4620, ¶ 13. As such, and despite the prosecutor's reference to the grand jury's decision to indict, we cannot say that Merriweather was denied a fair trial because of the prosecutor's opening statement.

{¶ 50} Secondly, Merriweather argues that the prosecutor engaged in misconduct by indicating during closing and rebuttal arguments that Merriweather had fabricated his testimony and that he was lying. Again, Merriweather did not object to the prosecutor's statement, and we will review such for plain error. During closing arguments, the prosecutor addressed Merriweather's testimony, and stated, "he's woven into that evidence a plausible, unbelievable, but plausible story. I'm going to call it a story, because it's a story, ladies and gentlemen." The prosecutor further stated, "this defendant has fabricated his testimony to you." During rebuttal argument, the prosecutor further referenced Merriweather and "his self-serving statements, which are created moments before trial." The prosecutor also stated, "It's only after 11 months of sitting on this case, looking at a video, having the State's evidence, we finally get a story – a brand new story, only two hours ago, no one's ever heard before – it doesn't make any sense. That's not what rational actors that have done nothing wrong do. Lying and manipulating are what the killer does."

{¶ 51} This court has previously determined that it is generally improper for a prosecutor to express his personal belief or opinion as to the credibility of a witness or that he believes the defendant is lying. *Jones*, 2008-Ohio-865 at ¶ 23. However, a review of the record indicates that the prosecutor's statements were in regard to Merriweather's testimony at trial that he lied to police about not shooting a gun during the incident. In fact, during Merriweather's cross-examination, he admitted to fabricating and lying during his initial interview with police when he testified, "Yes, I lied * * *." The state also asked, "you lied to

police that entire time* * *, to which Merriweather responded, "Yes, sir, that's correct."

{¶ 52} The prosecutor's statements, when taken in context, appear to be commenting upon the evidence, and furthermore, the results of the trial would have not have been different absent the statements. The jury was well-aware that Merriweather's story had changed over time, and that he chose not to tell police on the night of the incident that he shot a gun. Nor did Merriweather inform police in the several weeks after his initial interview that he fired a gun in the air. As such, the jury was in the best position to judge credibility, and the record does not indicate that the jury was swayed one way or the other simply because the state commented upon Merriweather's own testimony that he lied to police and changed his story about the night of the incident.

{¶ 53} Merriweather also asserts that the prosecutor engaged in misconduct by using the photographs that were objected to at trial. However, and as determined in Merriweather's third assignment of error, the photographs were properly admitted by the trial court and were therefore properly used by the state.

{¶ 54} Merriweather also alleges that the state engaged in prosecutorial misconduct by making a comment during closing argument that shifted the burden of proof to him. During closing arguments, the prosecutor stated,

> where is the evidence before you that puts a single other person, beside this defendant and Rafael Knight, as handling a firearm that evening, that 40-caliber Smith & Wesson that was shooting those DRT rounds? Any other witness. There isn't one except for the Defendant's self-serve statements of, "Gee, what about all these other people," no one's heard about, scene [sic], or described, well, today.

However, before the state made that statement during closing arguments, the prosecutor specifically referenced the fact that Merriweather did not have the burden of proof. Moreover, the Ohio Supreme Court has reiterated time and again its "long-standing precedent that the state may comment upon a defendant's failure to offer evidence in support

of its case." *State v. Collins*, 89 Ohio St.3d 524, 527 (2000).

{¶ 55} The prosecutor's statements regarding Merriweather's self-serving testimony as his only evidence was not prosecutorial misconduct where the state was merely commenting upon the fact that other than his testimony Merriweather offered no support of his claim that another member of his party fired the shots at Crockett and killed Brown. Thus, the prosecutor's statement was a comment on the evidence presented, specifically Merriweather's testimony on direct and cross-examination. The jury was informed that the state held the burden of proof, and the prosecutor's statements during closing did nothing to shift that burden to Merriweather.

{¶ 56} After reviewing the record, we find that Merriweather was not deprived a fair trial by any of the prosecutor's statements or actions, and as such, was not subjected to prosecutorial misconduct. Merriweather's fourth assignment of error is therefore, overruled.

{¶ 57} Assignment of Error No. 5:

{¶ 58} APPELLANT'S SENTENCE WAS CONTRARY TO LAW.

{¶ 59} Merriweather argues in his final assignment of error that the trial court erred by sentencing him to a mandatory prison sentence for the felonious assault conviction.

{¶ 60} As previously stated, Merriweather was sentenced to four years for his felonious assault conviction. The trial court listed this four-year sentence as "mandatory" in its sentencing entry. However, and according to R.C. 2903.11, felonious assault is a second degree felony that carries a presumption of prison. A mandatory sentence may be imposed by certain circumstances according to R.C. 2903.11(D)(1)(b) and R.C. 2929.13(F)(1)-(18). None of those circumstances apply to the case sub judice. The state concedes this error.

{¶ 61} During sentencing, the trial court did not classify the felonious assault sentence as being mandatory. The trial court's sentencing entry contains a clerical error that may now be corrected through a nunc pro tunc entry. The trial court's corrected entry can

then reflect what the court actually decided at sentencing, that the four-year sentence was not mandatory.

{¶ 62} Merriweather's final assignment of error is sustained, and the matter is remanded to the trial court for the sole purpose of issuing a nunc pro tunc entry to remove the word "mandatory" from the court's sentence on Merriweather's felonious assault conviction.

{¶ 63} Judgment affirmed in part, reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

HENDRICKSON, P.J., and M. POWELL, J., concur.