[Cite as *State v. McFarland*, 2022-Ohio-2326.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-05-053 |
| - vs - | : | O P I N I O N<br>7/5/2022 |
| | : | |
| PEYTON MICHAEL McFARLAND, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-06-0637

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

John H. Forg, III, for appellant.

**BYRNE, J.**

{¶1} Peyton Michael McFarland appeals from his conviction for murder in the Butler County Court of Common Pleas. For the reasons described below, we affirm McFarland's murder conviction.

### I. Procedural Background and Trial Testimony

### A. Indictment and Jury Trial

{¶2} A Butler County grand jury indicted McFarland on three counts: (1) Count

One, murder, a violation of R.C. 2903.02(B); (2) Count Two, felonious assault causing physical harm by means of a deadly weapon, a violation of R.C. 2903.11(A)(2); and (3) Count Three, felonious assault causing serious physical harm, a violation of R.C. 2903.11(A)(1). The indictment arose from allegations that McFarland stabbed and killed his roommate, Christopher Hacker. The matter proceeded to a five-day jury trial in April 2021.

### B. Trial Testimony

{¶3} Below is a summary of the key testimony offered by eight witnesses who testified at trial, including McFarland.

### 1. McFarland and His Roommates

{¶4} McFarland lived in a house in the city of Monroe owned by his mother. McFarland had a part-time food service job but testified that he spent more time playing video games than working. Specifically, he estimated that he spent 8 to 10 hours per day playing video games.

{¶5} McFarland had two roommates: his sister, Leah, and her boyfriend, Hacker. McFarland testified that Leah's and Hacker's relationship was "extremely complicated" and "very violent." McFarland believed that Hacker did not approve of his "lifestyle."

{¶6} There was a large size difference between McFarland and Hacker. McFarland testified that he was 5 feet 4 inches tall and 120 pounds, while Hacker was 6 feet tall and 200 pounds.

### 2. McFarland's Testimony on Fatally Stabbing Hacker

{¶7} McFarland admits that he fatally stabbed Hacker on May 30, 2020. According to McFarland, that day he had been playing an online video game in his room, with his bedroom door locked, when Leah came to his door asking him to clean the dishes in the kitchen. He told her he would not clean the dishes. Then his father, who was apparently

visiting, came to his door and asked him to do the dishes. Again, he said he would not do the dishes. McFarland explained that he would not do the dishes because they were a collection of Leah and Hacker's dishes.

{¶8} McFarland testified that Hacker later started banging on McFarland's bedroom door. Hacker cursed at McFarland and told him to do the dishes. McFarland cursed back, stating he would not do the dishes. Hacker threatened to break the door down. McFarland testified that Hacker's threat made him scared. To deescalate the situation, McFarland told Hacker he would do the dishes, but later.

{¶9} McFarland kept playing his video game for around five minutes until the internet was disconnected, which prevented him from playing the video game. To investigate the cause of the disconnection, McFarland testified that he planned to go to a nearby bedroom where the internet router and modem were located.

{¶10} According to McFarland, he opened his bedroom door, took one step out, and saw Hacker standing in the doorway of the bedroom where the router and modem were located. McFarland said Hacker appeared "angry" and "very scary looking." McFarland claimed that Hacker then stated, "I'll fuck you up." At that point, McFarland reached down for a weapon that he kept near his bedroom door. McFarland stated that he grabbed the weapon because he thought Hacker planned to hurt him.

{¶11} McFarland described the weapon as a "fantasy weapon." Photographs entered into evidence depict an axe and knife. The two objects could be made into one unit because the knife blade could be sheathed or hidden inside the axe handle, by inserting it into the handle and then screwing it in to secure it. McFarland described the weapon as being in its sheathed form when he reached for it. That is, he stated that after picking up the weapon, he took time to unscrew the knife from the axe handle and pull the knife out of its sheath. McFarland testified that he was then holding the axe in his left hand and the

knife in his right, with the blade pointed downwards.

{¶12} McFarland claimed that Hacker then began to walk towards him. In response, McFarland stated, "Get away from me." Hacker then took the axe from him. Hacker raised the axe above his head and, according to McFarland, "kept coming towards me." When asked if Hacker was "hitting you," McFarland responded, "I believe so." McFarland then stated that he stabbed Hacker.

{¶13} Under cross-examination, the prosecutor questioned McFarland as to how Hacker was able to take the axe from him without McFarland striking Hacker with the knife. McFarland stated that Hacker was "very fast" and that he did not stab Hacker when Hacker reached for the axe because "I did not want to hurt anyone at the time."

{¶14} McFarland stated that as Hacker advanced on him, McFarland was backing away. That said, he admitted that the front door was behind him and that he did not turn and run.

{¶15} McFarland also testified that Hacker had not yet struck him, but that McFarland decided to "lunge at him." The prosecutor pressed McFarland for details about how he was able, from his position in front of Hacker, to stab the larger, taller man in the back. McFarland stated, "I don't know" and added that the events were "very blurry for me." McFarland responded, "I don't know," to a variety of the prosecutor's questions about what happened during the altercation.

{¶16} McFarland later added that he was able to stab Hacker by lunging "up in the air." He also stated that Hacker was "towering" over him during the altercation.

{¶17} McFarland stated he did not know whether he had been struck by the axe or if Hacker ever physically touched him before McFarland stabbed Hacker. McFarland admitted he did not complain to any of the responding police officers about any bleeding, lacerations, or pain to his face. He did state that he complained to an officer about pain in

his hip.

{¶18} Even so, McFarland claimed that he suffered injuries because of Hacker attacking him, though he did not know if those injuries were caused by the axe. McFarland explained that those injuries were depicted in certain photographs admitted at trial that showed red marks on his right eyelid, under his left eye, and on his left arm.

### 3. The Neighbors Interact with Hacker

{¶19} At some point after being stabbed, Hacker left the house. A neighbor, Jennifer Johnson, was on her front porch watering flowers. She heard someone call out "Peyton" (that is, McFarland's first name) and "come help." She turned around and observed Hacker outside his house. He had a towel wrapped around his shoulder and he had blood on his hand. He called out "Peyton" again. Jennifer asked Hacker if he needed help. Hacker asked her to "please call 9-1-1."

{¶20} Jennifer called her husband for help. Her husband, David Johnson, testified that when he went outside, Hacker was stating, "help me." He directed Hacker to sit down on the Johnsons' porch. Hacker was "obviously in distress." David ran back inside to get a towel, returned, and applied first aid pressure to the wound he observed. David asked Hacker who did this to him. Hacker responded, "Peyton," "my roommate." David asked Hacker "why did this happen?" David described Hacker's answer: "it had to do with the dishes needed to be done * * * they weren't being done, so he [Hacker] changed the internet password, and then wouldn't provide it to his roommate; that led to an argument."

### 4. McFarland's 9-1-1 Call

{¶21} McFarland called 9-1-1 at some point after stabbing Hacker. The call was recorded and played at trial. McFarland told the dispatcher, "I need an ambulance to come to 146 Sands Avenue, Monroe, Ohio * * * an ambulance and a police officer, please." McFarland explained, "I attacked a person that I was living with, I need an officer to come

and arrest me." The dispatcher asked whether McFarland used any weapons, and McFarland answered that he had used a knife. McFarland then stated, "I need an officer to come right away, I need to be put under arrest."

{¶22} McFarland identified Hacker as the victim. He explained that he stabbed Hacker "on the shoulder," "four or five times." McFarland then stated, "oh my god, I fucked up so bad. I am going to jail for sure, oh my god, I cannot believe this." McFarland repeatedly asked the dispatcher if she had someone coming to arrest him, and he stated, "I want this to be over."

{¶23} During the trial, McFarland conceded that his testimony was "completely at odds" with what he told the dispatcher during the 9-1-1 call.

### 5. McFarland's Arrest and the Police Investigation

{¶24} Police dispatched to McFarland's home in response to the 9-1-1 call. Multiple law enforcement officers arrived on scene, and three testified.

{¶25} Lieutenant Beacock of the Monroe Police Department testified that she was informed by dispatch that the suspect would be in the front of the residence. When she arrived, she observed McFarland lying prone on the driveway. She handcuffed McFarland. McFarland stated to Lieutenant Beacock, "it's my fault." Lieutenant Beacock noted that McFarland had blood on his hands. She did not observe any injuries on McFarland. McFarland told her he had not been stabbed. Lieutenant Beacock testified that McFarland was asked if he was injured and he said, "no."

{¶26} Lieutenant Beacock recovered two weapons on the driveway. The first was an axe. The second was a knife with an approximate seven-inch blade. The state played Lieutenant Beacock's body camera footage, which corroborated her testimony.

{¶27} Officer Daniel Pratt testified that he transported McFarland to the Monroe Police Department. During that transport, McFarland made the statement, several times,

that he had "fucked up."

{¶28} Ohio Bureau of Criminal Investigation Special Agent Rachel Phelps testified that she was asked to assist the Monroe Police Department in collecting evidence and preserving photographs of the crime scene. At trial she identified a series of photographs introduced into evidence that depicted the crime scene in the home. Some of these photographs depicted a substantial quantity of blood on the floor in a hallway of the home, outside of McFarland's bedroom. Other photographs depicted a large pile of dirty dishes in and around the kitchen sink.

{¶29} Agent Phelps also took photographs of McFarland after he was apprehended. While the photographs are largely unremarkable, McFarland's counsel questioned Agent Phelps about whether certain photographs depicted "injuries" on McFarland's body. Some photographs depicted small red spots or marks below McFarland's eyelid, underneath his eye, and on his arm. Agent Phelps testified that McFarland was not complaining of any injuries. Though he did have blood on his body, he was not actively bleeding.

### 6. Hacker's Death and Autopsy

{¶30} Jacob Zeckser, a firefighter paramedic, testified about rendering aid to Hacker on the scene and transporting Hacker to Atrium Medical Center. Hacker became unresponsive as they were unloading him at Atrium Medical Center. Hacker had no pulse and was not breathing.

{¶31} A chief deputy coroner, Dr. Lee Lehman, testified that he performed Hacker's autopsy. Hacker had five stab wounds. He had two on his back in his left shoulder region, a third on his back near his left armpit, one in the front on the right side of his chest, and a stab wound to the palm of the left hand.

{¶32} Dr. Lehman described the trajectory of one of the two stab wounds in the shoulder area. That wound penetrated six and one half inches downward into Hacker's

chest cavity, towards the spine, and ultimately penetrated the aorta. It was a fatal injury because the aorta is the body's main artery and, after this injury, Hacker's body would not have been able to maintain blood pressure.

{¶33} Dr. Lehman explained that the other stab wounds penetrated Hacker's body to a much lesser degree. The deepest of those was the stab wound to the armpit area, which penetrated approximately two and one quarter inches and did not penetrate the chest cavity.

{¶34} Dr. Lehman stated that Hacker's cause of death was the previously mentioned six-and-one-half-inch deep stab wound to the back and that the manner of death was homicide.

## C. Jury Instructions, Verdict, and Sentence

{¶35} Following closing arguments, the trial court instructed the jurors on the three counts with which McFarland was charged and provided an instruction on self-defense. The jury returned guilty verdicts on all three counts. The trial court sentenced McFarland to an indefinite prison term of 15 years to life.

## II. Law and Analysis

{¶36} McFarland appealed, raising the following single assignment of error:

{¶37} THE TRIAL COURT ERRED IN CONVICTING PEYTON [MCFARLAND] OF MURDER WHEN THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT HE ACTED IN SELF-DEFENSE.

{¶38} McFarland contends that the jurors lost their way in convicting him of murder because the greater weight of the evidence demonstrated that he acted in self-defense. He argues that the evidence showed that he only stabbed Hacker to prevent Hacker from harming him. We disagree.

**A. Manifest Weight Standard of Review**

{¶39}  A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other."  *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14.  To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.  *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.  "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'"  *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81, quoting *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26.  An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal.  *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**B. State's Burden to Disprove Self-Defense**

{¶40}  The jury convicted McFarland of murder in violation of R.C. 2903.02(B), felonious assault causing physical harm by means of a deadly weapon in violation of R.C. 2903.11(A)(2), and felonious assault causing serious physical harm in violation of R.C. 2903.11(A)(1).

{¶41} For the offense of murder, the state was required to prove beyond a reasonable doubt that McFarland "cause[d] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of

the first or second degree * * *." R.C. 2903.02(B). The "offense of violence that is a felony of the first or second degree" from which death must proximately result was, in this case, felonious assault. See R.C. 2903.11(D)(1)(a) (stating felonious assault is a felony of the second degree). McFarland does not challenge his convictions for felonious assault on appeal. Nor does McFarland challenge that he "cause[d] the death" of Hacker "as a proximate result of" his felonious assault of Hacker. In fact, McFarland does not argue that the state failed to prove any element of murder under R.C. 2903.02(B).

**{¶42}** Instead, McFarland argues that the state failed to meet its burden of proving that he did not act in self-defense.[1] As to self-defense, we have explained that:

> An accused is justified in the use of force against another if (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the accused did not violate any duty to retreat or avoid the danger.

*State v. Byrd*, 12th Dist. Warren No. CA2019-07-073, 2020-Ohio-3073, ¶ 23, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus; *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). A statute, R.C. 2901.05(B)(1), provides that when "there is evidence presented that tends to support that the accused person used the force in self-defense * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." In other words, the state must "disprove one of the aforementioned elements of self-defense beyond a reasonable doubt." *Byrd* at ¶ 23, citing *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31, in turn citing *Robbins* at paragraph two of the syllabus.

---

1. In its brief, the state cites case law from this court from 2013 and argues that McFarland had the burden of going forward with evidence of self-defense and must prove self-defense by a preponderance of the evidence. But in 2019, the legislature amended R.C. 2901.05, the statute addressing self-defense. The state's statement of the law of self-defense is not current.

**{¶43}** The self-defense elements and the state's burden can be a bit confusing, because this is the rare situation when the General Assembly requires the state to *disprove* a fact or element. To restate the self-defense elements and the state's burden in a more practical manner, the state is required to *disprove* self-defense by *proving* beyond a reasonable doubt that McFarland (1) was at fault in creating the situation giving rise to the affray, *or* (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, *or* (3) violated a duty to retreat or avoid the danger. See *Byrd* at ¶ 23. The state need prove only one of these elements to disprove that a defendant acted in self-defense. *Id.* Given its verdict finding McFarland guilty of murder and rejecting McFarland's self-defense argument, the jury must have concluded that the state proved that at least one of these three situations applied.

## C. Analysis

**{¶44}** McFarland's argument appears to be that (1) the jury wrongly found that the state proved that he was at fault in creating the situation that led to the affray, and (2) the jury wrongly found that he did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape.[2]

**{¶45}** In his appellate brief, McFarland argues that "Hacker began the altercation at issue between McFarland and himself." Specifically, McFarland argues that Hacker "yelled" at McFarland to clean up the dishes, "banged on McFarland's bedroom door hard enough

---

2. The state did not argue or present evidence showing that McFarland violated a duty to retreat. This is unsurprising, because there was no duty to retreat when both McFarland and Hacker were lawful residents of the house. *See* former R.C. 2901.09(B) ("a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense") ("former" statute cited because statute was amended after the events at issue in this case).

that he cracked it," then "removed the internet connection so that McFarland could not (sic) longer play his video game." McFarland further argues that Hacker was "standing in the doorway and attempting to move towards him," so "[c]learly, Hacker was acting aggressively towards McFarland." As a result, McFarland contends that he was justified in grabbing his combined sword and axe "fantasy weapon" "to protect himself" before Hacker "grab[bed] it out of his hands" and "continued to move aggressively towards McFarland." McFarland concludes his brief by arguing that "Hacker, not McFarland, began the aggressive altercation between the two and * * * he, in fact, first attacked McFarland." But notably, McFarland does not argue on appeal (as he first testified at trial, before saying he was unsure) that Hacker ever struck him with the axe or anything else before he stabbed Hacker.

{¶46} Because Hacker died and no one else was present, only McFarland could testify to what happened. But this did not mean the jury had to credit and believe McFarland's story. On the contrary, the jury's task was to analyze the evidence offered by the state and McFarland and decide what happened.

{¶47} Given its verdict, the jury apparently disbelieved some or all of McFarland's testimony and accepted the state's theory of the evidence, in whole or in part. This was well within the jury's purview as the trier of fact and ultimate factfinder. *See State v. Simmons*, 12th Dist. Warren No. CA2020-10-069, 2021-Ohio-3563, ¶ 75; *see also State v. Pittman*, 9th Dist. Summit No. 29705, 2021-Ohio-1051, ¶ 19 ("[t]he jury was free to find [the defendant's] testimony regarding self-defense not credible, and instead believe the state's version of the events"). "[T]he jury did not have to accept [the defendant's] claim of self-defense simply because he asserted the defense at trial." *Simmons* at ¶ 76, citing *State v. Moore*, 12th Dist. Fayette No. CA2020-09-016, 2021-Ohio-1856, ¶ 18; and *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85 ("[t]he fact that [the defendant]

testified concerning his affirmative defense of self-defense does not mean that the jury had to believe him").

{¶48} After thoroughly reviewing the record, weighing inferences, and examining the credibility of the witnesses, we find McFarland's conviction for murder was not against the manifest weight of the evidence. The jury did not lose its way and create a manifest miscarriage of justice in finding McFarland guilty of murder and rejecting McFarland's self-defense argument. We find competent and credible evidence proving that McFarland did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape

{¶49} First, the location of the stab wounds on Hacker's body was such that the jury could conclude that McFarland attacked Hacker from behind and by surprise. The wound pattern suggests that McFarland first stabbed Hacker twice *in the back*, one stab of which fatally injured him. The locations of the other stab wounds are consistent with Hacker beginning to turn to face McFarland, as McFarland continued stabbing him, in the armpit, then either in the hand or chest. The stab wound to Hacker's palm indicates a defensive injury and contradicts McFarland's testimony that he was attacked by Hacker.

{¶50} The jury was also free to disbelieve McFarland's claim that Hacker attacked him with a raised axe. This claim, simply put, was not credible. McFarland claimed he could not recall whether Hacker hit him with the axe or physically touched him. When asked if Hacker was hitting him, McFarland could only offer, "I believe so." But there were no significant injuries on McFarland's body after the altercation, and certainly no injuries that would result from being hit by an axe. When Lieutenant Beacock asked McFarland if he was injured, he said, "no." The same was true with Special Agent Phelps, who testified that McFarland did not complain of injuries and was not bleeding. The "injuries" McFarland identified on photographs taken after the incident were little more than small red marks on

his skin.

**{¶51}** McFarland's testimony about the altercation was not credible in other ways as well. Though the much taller Hacker was "towering" over him and had allegedly raised an axe over his head, McFarland claimed he was somehow able to "lunge" "up in the air" and *over* the taller man and stab downwards into Hacker's back, all while avoiding any axe strikes. On cross-examination, McFarland repeatedly demonstrated his inability to explain how his scenario of Hacker attacking McFarland and McFarland stabbing Hacker in the back from his position in front of Hacker could have possibly occurred. Such physical feats may happen in action movies or video games, but the jury was free to conclude that such feats do not occur in real life and did not occur here.

**{¶52}** But the discrepancies between the physical evidence and McFarland's testimony were not the only reasons for the jury to doubt McFarland's self-defense claim. McFarland's own descriptions of the incident were inconsistent over time. Mere moments after the stabbing, McFarland told the 9-1-1 dispatcher that he "attacked" Hacker, that he stabbed him, that he used a knife, and that *he needed* to be arrested. McFarland's demeanor on that 9-1-1 could be described as desperate to be arrested. He stated he wanted this "to be over." He did not tell the 9-1-1 dispatcher or responding police that Hacker had attacked him or that he acted in self-defense.

**{¶53}** Nearly a year later, McFarland admitted that his trial testimony, during which he claimed self-defense, was "completely at odds" with what he said during the 9-1-1 call. But McFarland offered no credible explanation for why his story changed. *See Simmons* at ¶ 76 (verdict not against manifest weight and jury did not need to accept defendant's claim of self-defense when defendant provided statement to police sergeant "shortly after the incident occurred, wherein [the defendant] admitted that he 'fucked up' and that he was 'sorry'").

{¶54} For these reasons, the jury could find that McFarland's testimony was not credible and that he did not have a bona fide belief that he was in imminent danger of death or great bodily harm. Instead, the jury was free to conclude, as we do, that McFarland attacked Hacker without justification. Because the state is only required to prove that one of the self-defense elements was lacking to disprove that a defendant acted in self-defense, we need not examine McFarland's argument that he did not create the situation that gave rise to the affray. The state proved that McFarland did not act in self-defense and McFarland's assignment of error is overruled.

### III. Conclusion

{¶55} This is not a case in which the evidence weighed heavily in favor of acquittal. To the contrary, this is a case in which the evidence of McFarland's guilt was overwhelming, and the greater weight of the evidence supported the conviction. The state also proved beyond a reasonable doubt that McFarland did not act in self-defense. The jury did not lose its way in convicting McFarland of murder. *See Barnes*, 2011-Ohio-5226 at ¶ 81, citing *Thompkins*, 78 Ohio St. 3d at 387 (appellate court will overturn conviction due to manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal).

{¶56} Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.