[Cite as *State v. Speaks*, 2023-Ohio-4170.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-11-104 |
| | : | O P I N I O N |
| - vs - | | 11/20/2023 |
| | : | |
| JOSHUA SPEAKS, | : | |
| Appellant. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2021-08-1111

Michael T. Gmoser, Butler County Prosecuting Attorney, and Stephen M. Wagner, Assistant Prosecuting Attorney, for appellee.

Law Office of John H. Forg, and John H. Forg, III, for appellant.

**BYRNE, J.**

{¶ 1}  Joshua Speaks appeals from his felonious assault conviction in the Butler County Court of Common Pleas.  Speaks argues that the trial court improperly admitted certain evidence and that his conviction was against the manifest weight of the evidence. For the reasons described below, we find Speaks' arguments to be without merit and we

affirm Speaks' conviction.

## I. Factual and Procedural Background

{¶ 2}    In October 2021, a Butler County grand jury indicted Speaks on one count of felonious assault involving "serious physical harm to another" in violation of R.C. 2903.11(A)(1).  The indictment arose after Speaks assaulted and severely injured the victim, who was Speaks' roommate and landlord.  Speaks admitted to the assault but told law enforcement that the victim attacked him with a knife, and that he was defending himself.

{¶ 3}    The matter proceeded to a multiple-day jury trial.  We summarize the relevant testimony and other evidence below.

## A. Trial Evidence

### 1. Officer Evan Mosley's Testimony

{¶ 4}    Officer Evan Mosley, a Middletown police officer, testified that he was on patrol on August 14, 2021.  His patrol area included the residential address 3801 Central Avenue.  That afternoon, as he was driving by 3801 Central Avenue, he observed a "somewhat frantic" individual—Speaks—emerge quickly from the residence and make a noise.

{¶ 5}    Officer Mosley stopped and interacted with Speaks, whom Officer Mosley noted had blood on his shorts.  Speaks told Officer Mosley that he had been in an altercation with his roommate, Sarah Risner, and that she had pulled a knife on him.  Speaks did not indicate to Officer Mosley that he was injured, and Officer Mosley did not notice any injuries at that time.

{¶ 6}    Speaks told Officer Mosley that the last time he had seen Risner, she was in the residence, "upstairs."  Officer Mosley asked Speaks if Risner was still moving around the house, armed with the knife.  Speaks claimed he could not remember.  Officer Mosley then asked Speaks if he had lost consciousness.  He said he had not.  Speaks said the last time he saw Risner, she was upstairs, and that she was breathing.

- 2 -

{¶ 7} Officer Mosley entered the residence with other officers. They called out for Risner, who did not respond. Officer Mosley observed a knife on the steps leading up to the home's second floor/attic. There was no blood on the knife.

{¶ 8} Upon entering the home's attic, Officer Mosley located Risner, who was laying on her back. As he entered the attic, she sat up very quickly. Her own hair was covering her face and she was covered in blood. She had urinated on herself. She collapsed back to the floor. She was breathing, but not conscious, and not able to speak. Risner was gurgling her own blood. Officer Mosley called immediately for paramedics to enter the residence.

{¶ 9} Officer Mosley subsequently transported Speaks to the police department. On the way, Speaks told Officer Mosley that he had formerly resided in Las Vegas, where he was training as a mixed-martial arts ("MMA") fighter. At the jail, Speaks complained of injuries to his hands and asked for bandages. Officer Mosley noted that Speaks had marks and injuries on his knuckles, but not elsewhere on his hands or elsewhere on his body.

### 2. Photographs of Risner and the Crime Scene

{¶ 10} The state introduced photographs of Risner's face that were taken at the hospital, after Risner had been partially cleaned of blood. These photographs depicted the severity and extent of the injuries to Risner's face and to her skull.

{¶ 11} The state also introduced photographs of the exterior and interior of 3801 Central Avenue. Of relevance, photographs depict the stairs leading to the home's attic. On the second step of these stairs, photographs depict a small kitchen knife with a blue handle.

{¶ 12} Photographs of the attic depict a room approximately 10 feet wide by 20 feet long. The photographs depict a pool of blood in the area where Risner was first located by Officer Mosley. Blood stains and blood droplets also cover numerous objects throughout

the attic, including a substantial amount of blood staining on the upper portion of a chair. The photographs also depict significant blood splatter throughout the attic, covering items on the floor, on various walls, and the ceiling. In general, the photographs suggest that a chaotic and extremely violent event occurred in the attic.

### 3. Sarah Risner's Testimony

{¶ 13} Risner testified that 3801 Central Avenue was her residence and she had lived there since 2013. She was the owner of a local dog grooming business.

{¶ 14} Risner came to know Speaks through his sister, Danielle Ross, whom Risner had known since Ross was 10 years old. Risner stated that she was a "mother figure" to Ross. Ross had called Risner saying that she and Speaks were homeless. Not wanting Ross to be homeless, she invited Ross and Speaks to live with her temporarily. Speaks was allowed to stay just long enough to "get him on his feet."

{¶ 15} By August 14, 2021, Speaks had been living at 3801 Central Avenue for approximately six weeks. Speaks was living in the home's attic. At some point prior to August 14, 2021, Ross stopped residing at 3801 Central Avenue and went to a treatment center.

{¶ 16} Risner testified that prior to August 14, she and Speaks had discussed him moving out of her home. She wanted him to leave because he was messy, and she wanted her privacy back. She testified that they had an understanding that he would move out on August 14, which was a Saturday. So, on August 14, while she was at work, she recalled sending Speaks a text message stating that it was "time to go."

{¶ 17} The state introduced photographs of a text message exchange between Risner and Speaks. Risner messaged Speaks that someone was there to "move you" and that she was ready "to have my own space back." She added, "Today is the day bud."

{¶ 18} Speaks responded by stating that he could not move out that day but could

move out the following Monday. He claimed that he could not "even physically leave" until his boss came to pick him up. In response, Risner insisted that Speaks leave and told him to try to find a motel. The two exchanged additional messages which devolved into insults. Speaks threatened to put his own dog "in the pound" because of Risner asking him to move out and accused Risner of creating "drama."

{¶ 19} That day, Risner recalled driving home from her dog grooming business with a coworker who lived just a few houses away. She recalled that she parked at the coworker's house and believed that she walked home afterwards, but she did not actually recall the walk home. But she did remember being inside 3801 Central Avenue that day. And it was a "bad memory."

{¶ 20} The record reflects that Risner struggled to convey to the jury what that "bad memory" entailed. She recalled that Speaks dragged her up the stairs and that there was "lots of blood." She then reiterated that there was "lots of blood." Her next memory was of being in the hospital.

{¶ 21} As to the effects of the attack, Risner stated she now suffers from numerous medical issues. Those issues included but were not limited to suffering from "foreign accent syndrome," an inability to lift her arms, limited eyesight and peripheral vision, a non-functioning nostril, and an inability to feel anything on her forehead. Risner stated that her brain did not "work" and she was "exhausted." She used to be able to groom eight or nine dogs in a day at her business, but now she could only groom one dog before she became exhausted.

{¶ 22} Risner denied that she attacked Speaks with a knife and denied going up the attic stairs with a knife. Risner stated that she was not a violent person. Risner stated that she had tried to get a gun license but could not go through with it because she could not process the idea of harming someone.

**4. Detective Brook McDonald's Testimony**

{¶ 23} Detective Brook McDonald was the lead detective. At approximately 3:30 p.m. on August 14, 2021, his shift supervisor assigned him to investigate an altercation that occurred at 3801 Central Avenue. He understood that an individual had been involved in a fight with a roommate and that the roommate had sustained injuries and was being transported to the hospital for her injuries.

{¶ 24} Detective McDonald first responded to the hospital to see if he could obtain any information from Risner. When he saw Risner, Detective McDonald observed that she was very badly beaten. She had sustained a fracture of the orbital eye socket and a brain bleed. Hospital staff were preparing to load her onto an air care flight and fly her to another hospital.

{¶ 25} Risner was not verbally responsive to Detective McDonald in any way. He was aware that there was an allegation that she had used a knife against Speaks. He asked her if she had a knife and was trying to defend herself and she "just kind of nodded her head."

{¶ 26} After leaving the hospital, Detective McDonald went to interview Speaks at the police station. He noted that Speaks had blood on his clothing. Photographs admitted into evidence show that Speaks had blood on his shirt and on the lower portion of his shorts. Speaks also had injuries to his knuckles on both hands, and more significant injuries to the knuckles on his right hand. Speaks was right-handed.

{¶ 27} Detective McDonald spoke with Speaks in a video-recorded interview that was admitted at trial. During the interview, Speaks stated that he had been preparing to leave 3801 Central Avenue when Risner entered the attic, armed with a knife. She was cursing at him. Speaks told Detective McDonald that he then told Risner, "Sarah, put it down, put it down, you may get to stab me, but I will fucking kill you." Speaks had earlier

explained to Detective McDonald that he was 6 foot 2 inches tall and had been "cage fighting" for many years.[1]  Speaks stated that he kept screaming at Risner to put the knife down.  Instead, she came after him with the knife.  Speaks narrated what occurred after this as follows:[2]

> "Sarah, don't, this isn't going to end the way you think it is, stop, I know how to deal with people with knives, Sarah stop, Sarah stop, Sarah stop, Sarah stop," and then she just runs at me, and the next thing I know I'm grabbing something, threw it at her and, I don't remember much after that, I just… flipped, and she came straight at me with a knife, and I just remember picking something up, hurling it at her, and then tossing the knife over the side of the, there's this little banner[3] up there, tossing it over the banner, and just, I remember just screaming at her, "stop, stop, stop, stop," and, like, and she just would not stop, and even after I held her down, I'm like "stop," and she hit me again and I was like, fuck it, and I just snapped.

{¶ 28} When Detective McDonald asked what object he threw at Sarah, Speaks stated he could not remember.  He said he just picked up the first thing that was near him, hoping to stun her.  Speaks then described the interaction to Detective McDonald for a second time, as follows:

> **Speaks**:  I threw the knife at her, and she recoiled like this, and that's when the knife hit the ground, and I grabbed it and just threw it down the steps.
>
> **Detective McDonald**:  Wait wait, you said you threw what?
>
> **Speaks**:  I grabbed an object, and just hit her with it, when she did this,[4] she, did that to shield herself, and she could not hold onto the knife, so I punched her and threw the knife down, and she came at me again, and, I just… freaked, because I did not know what else to do, but I didn't know how else to stop her

---

1.  At trial, Speaks stated that he was 6 foot 4 inches.

2. Quotation marks indicate portions of Speaks' narrative to Detective McDonald where it appears Speaks was describing what he was communicating to Risner verbally during the altercation.

3. By "banner," Speaks was referring to a banister in the attic, which wrapped around the stairway entrance to the attic.

4. In the video, Speaks imitates what Risner did by raising his hands up to his head in a defensive posture.

doing anything else, and she started fucking grabbing for stuff, and I'm like mm-mmh, you're not grabbing a metal object to hit me or stab me or anything like—fuck this—you're going to stop, this is going to stop, I just want to leave, and at first tried I tried to pin her down like that and hold her, and "Sarah, just let me leave, stop, what are you doing?  Stop.  Quit.  Stop.  Stop trying to hit me.  Stop trying to hurt me.  Let me leave.  Go downstairs, lock yourself in your room.  Claim whatever you like.  Leave me alone," and that was when she reached for something and I just, snapped.

**Detective McDonald**:  What was she trying to reach for?

**Speaks**:  Don't know, saw her hand going and didn't give her the opportunity to get there, I just saw her hand go out like that, and fuck it, just started wailing on her.

{¶ 29}  Speaks described the kitchen knife to Detective McDonald as teal in color and indicated that it was of a smaller size.  He described the knife as "something she cuts carrots with."

## 5. Jail Calls

{¶ 30}  Speaks was incarcerated while awaiting trial.  During that time, the jail recorded his phone calls.  The state played excerpts from three of these calls at trial.

## a. The First Phone Call

{¶ 31}  On the first recorded phone call, Speaks told the person he was speaking to that Risner "came at me."  He threw a deck of cards at her.  She "came at" him and started "slashing" and sliced his hands with the knife.  Speaks claimed that he got slashed five or six times on his hands and "got multiple chunks cut out."  Speaks explained that his next thought was "screw it, I'm not going to grab her knife, I'm going to start swinging."

{¶ 32}  Speaks stated that he lost control because he thought Risner was going to hurt him.  Speaks said he had no other way out of the attic other than jumping out of the window or over the banister.  Speaks stated that it was Risner's fault that she got hurt because she came up the staircase with a knife.

**b. The Second Phone Call**

{¶ 33} On the second recorded phone call, Speaks tells the person he is speaking to that he is a foot taller than Risner and had "almost 100 pounds on her" and that "I'm far beyond her in training." He then states that he "never once perceived her as a threat." Instead, she was just someone who "mouths off." He added that he had never seen her "physically take actions against people."

**c. The Third Phone Call**

{¶ 34} On the third recorded phone call, Speaks tells the person he is speaking to that Risner "stabbed me with a fucking butcher knife."

**6. Medical Records**

{¶ 35} The state introduced into evidence Risner's medical records resulting from the assault. The medical records note that during the assault she sustained a left orbital blowout fracture, bilateral maxillary fractures, bilateral nasal bone fractures, facial lacerations, and a left frontotemporal subarachnoid hemorrhage (a brain bleed).

**7. Joshua Speaks' Testimony**

{¶ 36} After the state rested, Speaks took the stand. Speaks testified that on August 14, 2021, he was living in the attic of 3801 Central Avenue. Speaks said that he and Risner had agreed that he would move out the following Monday. He had planned to go live in barracks housing provided by the Veterans Administration.

{¶ 37} That day, he was asleep in the attic. However, at 1:00 p.m., he received text messages from Risner telling him he needed to "pack, leave, go." He agreed to leave, and he called his boss to come pick him up. His boss agreed to do so when he was finished with a job.

{¶ 38} Speaks stated that he booked a hotel for that night and the next. He then started packing his belongings. Riser arrived at 3801 Central Avenue while he was still

exchanging text messages with her.

{¶ 39} According to Speaks, Risner "stomped very heavily" towards the door that leads to the attic and "flung it open." She screamed, "get the fuck out of my house right now at the top of her lungs." He continued packing. Speaks testified that he then heard a loud thudding sound as Risner ascended the stairs at a "very accelerated rate." He looked up and saw that Risner was now standing in the attic, 10 to 15 feet away from him, with a knife in her hands. He put his hands up to signal fear and to calm her down. He asked her to "stop" and "point it down." However, he was not successful in calming Risner. Instead, she started "revving herself up, hyperventilating, screaming at me." He then saw her posture "change into a lean." He screamed, "don't!" And then she charged at him at a "full sprint."

{¶ 40} Speaks stated that when Risner charged him, he happened to be holding a plastic box of "Magic: The Gathering" playing cards, which weighed about two pounds. He threw the box at Risner in the hope that she would let go of the knife or shield herself. However, the playing card diversion was not successful. Risner closed the gap between herself and Speaks in less than three seconds. Speaks then put his hands up to defend himself. Risner brought the knife down on him in an "arcing swing like a hack." That was when she lacerated his knuckle. She then cut him with the knife "a few times." At the same time she was cutting him, he "swung back and continued to swing [with his hands] until I felt her cease and stop."

{¶ 41} After about 10 to 20 seconds of what he described as fighting for his life, Speaks stated that he felt Risner "fall" into him. He backed up, put his hands out wide, and stopped fighting. Risner then hit the ground. He did not know where the knife was at this point.

{¶ 42} While she was on the ground, Risner made a final attempt to reach out to him. This panicked him because he could not see the knife. It was dark in the attic. He thought

that "maybe she was reaching for a weapon." In a "final scared attempt to save" himself, he "did a downward strike to stop her." And she then stopped moving.

{¶ 43} Afterwards, Speaks stated that a part of his "training just kicked in." He checked Risner's pulse and listened to her breathing to ensure she was stable. He then rotated her to her side because she was face down in blood, and so that she could attempt to breathe.

{¶ 44} Speaks then left Risner and went down the stairs. He saw the knife on the stairs and stepped over it. He went to the bathroom to try to clean his hands and to check himself for wounds. After he realized that his adrenaline was spiked and he could not "properly assess" himself, he called 9-1-1 to get paramedics for Risner, and for himself. He then went outside for fresh air and to wait for the police.

{¶ 45} As to the jail call where he stated he never perceived Risner as a threat, Speaks explained that he was talking to his sister. Speaks said his sister had a history of mental health issues, so he would always "gentle my language with her," and that he purposefully would attempt to minimize the "severity of anything."

{¶ 46} On cross-examination, the prosecutor asked Speaks about his background and training in MMA. Speaks discussed, at length, various aspects of the sport, including his knowledge of certain techniques, including "ground and pound" and "guards." He discussed the advantages of height and reach in the sport. He discussed his knowledge of the purposes of referees and their role in keeping the fights safe. Speaks stated that he had been in thirty-six MMA fights. Towards the end of this discussion, Speaks' counsel objected based on relevancy. The court overruled the objection and Speaks answered a few more questions about his knowledge of MMA fighting before the state moved on to a different subject.

{¶ 47} Speaks agreed that he was "roughly" 6 foot 4 inches tall and weighed 235

pounds on August 14, 2021. He agreed that he had been "cage fighting" for at least ten years. He further agreed that Risner was 5 foot 3 inches and approximately 150 to 160 pounds, and that she had no background or training in MMA of which he was aware.

{¶ 48} As to why he told someone on the recorded jail call that Risner had attacked him with a butcher knife, Speaks stated that he thought the knife was a butcher knife. But he added that he could not see the knife because the light in the attic was off during the altercation. He explained that the light was off because he had been asleep.

{¶ 49} As to why he described the knife to Detective McDonald in the recorded interview as a "little kitchen knife" that Risner cut carrots with, he responded that he was under duress, that he was "shellshocked, concussed" and did not have a clear mind at the time.

{¶ 50} Concerning how the much shorter Risner was able to "hack" at him with the knife, Speaks explained that he was crouching very low and trying to "close myself and make myself smaller at that point." And as to why he told Detective McDonald in the recorded interview that he grabbed the knife and threw it down the steps, Speaks explained that this was a "misrecollection."

### B. Self-Defense Instruction, Verdict, and Sentencing

{¶ 51} Speaks requested that the court instruct the jury on self-defense. The court agreed to do so, and instructed the jurors on self-defense involving the use of non-deadly force.[5] The jury found Speaks guilty of felonious assault. The court sentenced Speaks to an indefinite prison term, consisting of a minimum term of 8 years and a maximum term of 12 years. Speaks appealed, raising two assignments of error.

---

5. The issue of whether this was the appropriate instruction has not been raised on appeal.

## II. Law and Analysis

### A. Admission of Evidence of Background in MMA Fighting and Training

{¶ 52} Speaks' first assignment of error states:

{¶ 53} THE TRIAL COURT ERRED IN ALLOWING THE STATE, IN VIOLATION OF EVID. R. 404(B), TO INTRODUCE EVIDENCE THAT SPEAKS ACTED IN CONFORMITY OF HIS CHARACTER AND TRAINING.

{¶ 54} Speaks contends that the trial court erred in permitting the state to introduce testimony regarding his background in MMA training and fighting as such testimony was "blatantly inadmissible" pursuant to several of the Ohio Rules of Evidence. First, Speaks contends that the MMA evidence was character evidence, and therefore inadmissible in violation of Evid.R. 404(A). Second, Speaks contends that the MMA evidence was evidence of "other acts," and therefore inadmissible in violation of Evid.R. 404(B). Third, Speaks argues that the MMA evidence was "prejudicial" and therefore inadmissible under Evid.R. 403. Fourth, Speaks argues that the MMA evidence was not relevant, and therefore inadmissible under Evid.R. 401 and 402. In general, Speaks states that his MMA training and fighting background was not relevant to any element of felonious assault and its sole purposes was to portray him as an "angry person, someone with a general proclivity to violence" and to suggest that he acted aggressively rather than defensively in his interaction with Risner.

### 1. Standards of Review

{¶ 55} Before discussing the appropriate standards of review, we note that the fact of Speaks' MMA background was brought up repeatedly at trial during both the state's case and the defense's case. Officer Mosley testified that Speaks told him that he was or had been training in MMA. And Speaks volunteered that he was a trained fighter during his interview with Detective McDonald, which was played for the jury. During Speaks'

testimony, the prosecutor cross-examined him at length concerning his background in MMA and specifically regarding his familiarity with fighting techniques, knockouts, safety measures, and specific matches in which Speaks fought. Speaks testified that participating in the sport had been good for him from a mental perspective and that he had developed a sense of camaraderie with the other individuals who he trained with and fought with in the sport.

{¶ 56} After a considerable amount of this testimony had already been presented to the jury, Speaks' counsel objected when the prosecutor began asking Speaks about his knowledge of the bodily damage that could be done during an MMA fight. Defense counsel objected based on relevance and argued that the line of questioning was irrelevant. In response, the prosecutor argued that the fact that Speaks had an MMA background was relevant to disproving his claim of self-defense and specifically that it was not reasonable for him to use the amount of force he used. The prosecutor offered to "wind down" this line of questioning, which Speaks counsel seemed to agree to. It is not clear from the record whether Speaks' counsel withdrew his objection. Regardless of whether there was a withdrawal, the court overruled Speaks' objection.

{¶ 57} Afterwards, the state asked Speaks a few additional questions concerning his knowledge of MMA fighting, and specifically whether a fighter can be punched so hard that he or she would be rendered unconscious. Speaks agreed that this was possible and agreed that if this happened in an MMA match, a referee would step in to stop the fight, to prevent further injury to the unconscious fighter.

{¶ 58} Speaks now concedes that he only belatedly objected to questions related to his MMA background. In fact, Speaks did not object to most of the questions concerning Speaks' MMA background. Therefore, to the extent Speaks now challenges the admission of MMA background evidence that was offered prior to his objection, we review the

admission of that evidence for plain error. *State v. Buell*, 12th Dist. Warren No. CA2015-11-102, 2016-Ohio-5477, ¶ 32.

{¶ 59} Crim.R. 52(B) provides that "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." That rule "places three limitations on a reviewing court's decision to correct an error not raised before the trial court." *State v. Fuell*, 12th Dist. Clermont No. CA2020-02-008, 2021-Ohio-1627, ¶ 70, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "First, an error, 'i.e., a deviation from a legal rule,' must have occurred." *Fuell* at *id.*, quoting *Barnes* at ¶ 27. "Second, the error complained of must be plain, i.e., it must be 'an "obvious" defect in the * * * proceedings.'" *Id.* Stated otherwise, the error must be fundamental, palpable, and obvious on the record such that it should have been apparent to the court without an objection. *State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 30. "Third, the error must have affected 'substantial rights.'" *Fuell* at ¶ 70, quoting *State v. Martin*, 154 Ohio St.3d 513, 2018-Ohio-3226, ¶ 28. This means the error must have affected the outcome of the trial. *Barnes* at 27. An appellate court will take notice of plain error with "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12.

{¶ 60} But to the extent that Speaks challenges MMA background evidence to which his counsel specifically objected, the admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. White*, 12th Dist. Warren No. CA2018-09-107, 2019-Ohio-4312, ¶ 30. An abuse of discretion exists where the court's decision was unreasonable, arbitrary, or unconscionable. *State v. Brand*, 12th Dist. Butler No. CA2021-08-093, 2023-Ohio-557, ¶ 63.

{¶ 61} Finally, and specifically with respect to other-acts evidence, we apply a mixed

standard of review. *State v. Schmidt*, 12th Dist. Warren No. CA2021-12-115, 2022-Ohio-4138, ¶ 25, citing *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22. The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law that we review de novo. *Id*. In a de novo review, we independently review the record without giving deference to the trial court's decision. *State v. Gross*, 12th Dist. Warren No. CA2021-03-017, 2021-Ohio-4546, ¶ 10. However, the determination of whether the admission of other-acts evidence would be prejudicial to the accused requires the exercise of a trial court's discretion. *Schmidt* at *id*. We review that latter determination for an abuse of discretion. *Id*.

**2. Other-Acts Evidence – Evid. R. 404(B)**

{¶ 62} Evid.R. 404(B)(1) provides that evidence relating to "other crimes, wrongs or acts" cannot be admitted for the purpose of proving "a person's character in order to show that on a particular occasion the person acted in accordance with the character." It may, however, be admissible for other purposes, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2).

{¶ 63} Speaks fails to articulate why his testimony regarding a background in MMA training and fighting constitutes evidence of "other crimes, wrongs or acts" as set forth under Evid.R. 404(B). Speaks also fails to cite any authority in support of this contention. An MMA fighting background is not a crime—that it, it is not illegal—nor does it tend to demonstrate the commission of any offense. Moreover, there is nothing inherently negative or prejudicial about having a background in MMA fighting and training that might indicate it should be considered a "wrong," or "act" within the scope of Evid.R. 404(B). If anything, having a professional MMA fighting background could be seen as deserving of esteem, given that advanced training in any professional or amateur sport requires discipline,

commitment, effort, and skill.

{¶ 64} Based on the record, Speaks was clearly proud of his background in MMA fighting and training. He told multiple witnesses that he had training and experience in MMA. And he readily discussed his knowledge with the prosecutor during cross-examination. The fact that Speaks had a professional fighting background is not within the ambit of "other crimes, wrongs, or acts" as set forth in Evid.R. 404(B). *See State v. Smith*, 49 Ohio St.3d 137, 140 (1990) ("Evid.R. 404[B] is essentially an extension of Evid.R. 404[A] which is intended to preclude a prejudicial attack on a defendant's character"). Accordingly, whether we review the admission of evidence regarding Speaks' MMA background under the de novo standard, the abuse of discretion standard, or a plain error standard, we find no merit to Speaks' argument that the trial court violated Evid.R. 404(B) in admitting that evidence.

### 3. Character Evidence – Evid.R. 404(A)

{¶ 65} Alternatively, Speaks argues that his MMA training was inadmissible character evidence. Under Evid.R. 404(A), "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity * * *" subject to certain exceptions not applicable here. However, the fact that Speaks had an MMA background was not evidence of Speaks' character or of a character trait. Nor was that evidence introduced by the state to demonstrate that Speaks acted in conformity with being a professional fighter. Instead, as will be discussed below, his MMA training and background was relevant to other issues in the case. We therefore find that, whether we review the admission of evidence regarding Speaks' MMA background under an abuse of discretion standard or a plain error standard, such evidence was not admitted in violation of Evid.R. 404(A).

**4. Relevancy – Evid.R. 401 and 402**

{¶ 66} Speaks next argues that evidence of his MMA background was irrelevant under Evid.R. 401 and 402, and therefore inadmissible.  We disagree.

{¶ 67} Evid.R. 402 provides that all relevant evidence is admissible and that evidence that is not relevant is not admissible.  "Relevant evidence" "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.

{¶ 68} The state charged Speaks with felonious assault in violation of R.C. 2903.11(A)(1), which provides that no person shall "knowingly * * * cause serious physical harm to another * * *."  The Revised Code defines the culpable mental state of "knowingly" as follows,

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 69} Upon review, we do not find any plain error or abuse of discretion in the admission of the MMA evidence due to irrelevancy.  Speaks' background as a professional fighter was relevant to demonstrate his knowledge that the assault he inflicted upon Risner would result in serious physical harm.  That is, Speaks' experience or training in MMA and his participation in thirty-six MMA fights would suggest that he was aware that his actions would probably result in serious physical harm to Risner.  *See State v. Jacinto*, 8th Dist.

Cuyahoga No. 108944, 2020-Ohio-3722, ¶ 96-97 (evidence of fighting or boxing experience noted to be relevant to knowledge that a punch would cause serious physical harm); *State v. Boscarino*, 2d Dist. Montgomery No. 25580, 2014-Ohio-1858, ¶ 22 (defendant's status as MMA fighter relevant to awareness that punches could inflict serious physical harm).

{¶ 70} In addition, Speaks asserted self-defense. To disprove his claim of self-defense, the state was required to prove beyond a reasonable doubt that Speaks did not use force in self-defense. R.C. 2901.05(B)(1). In a case involving the use of non-deadly force, an accused is justified in using force against another if (1) he was not at fault in creating the situation giving rise to the altercation and (2) he had reasonable grounds to believe and an honest belief, even though mistaken, that he was in imminent danger of bodily harm and his only means to protect himself from the danger was by the use of force not likely to cause death or great bodily harm. *State v. Clemmons*, 12th Dist. Butler No. CA2020-01-004, 2020-Ohio-5394, ¶ 22.

{¶ 71} Speaks' training and experience in MMA was relevant to the issue of whether he had reasonable grounds to believe that Risner's alleged actions placed him in imminent danger of bodily harm. Given his claimed level of training, the jury could conclude that Speaks could not have reasonably viewed Risner as a legitimate threat of inflicting bodily harm, even if armed with a knife. And in fact, there was evidence to support this view from Speaks himself. In one of the versions of events that he told to Detective McDonald, Speaks claimed he warned Risner that he knew how to defend himself from people with knives. Furthermore, he boasted on a jail phone call that he never seriously considered Risner a threat.

{¶ 72} Speaks' arguments regarding Evid.R. 401 and 402 are without merit.

### 5. Unfair Prejudice – Evid.R. 403

{¶ 73} Finally, Speaks argues that evidence of his background in MMA training and

fighting was unfairly prejudicial under Evid.R. 403. Pursuant to Evid.R. 403(A), a court *must* exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice * * *." For the reasons stated above, we do not find that the relevance of Speaks MMA background was substantially outweighed by the danger of unfair prejudice. As discussed above, Speaks' MMA background was relevant to the issues in the case and there is nothing inherently prejudicial concerning having a background in MMA. Therefore, there was no danger of unfair prejudice due to its admission into evidence.

{¶ 74} For these reasons, we conclude that the court did not commit legal error, plain or otherwise, or abuse its discretion by failing to sustain Speaks' objection concerning evidence related to his background in MMA fighting. Nor did the court plainly err in failing to sua sponte exclude such evidence from the trial. The evidence was relevant to various issues in the case and was not inadmissible under the rules of evidence, as described above.

{¶ 75} We overrule Speaks' first assignment of error.

### B. Manifest Weight of the Evidence

{¶ 76} Speaks' second assignment of error states:

{¶ 77} THE TRIAL COURT ERRED IN CONVICTING SPEAKS OF AGGRAVATED ASSAULT [SIC] WHEN THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT HE ACTED IN SELF-DEFENSE.

{¶ 78} Speaks contends that his conviction for felonious assault was against the manifest weight of the evidence.[6] Speaks argues that the jury lost its way in convicting him because it ignored evidence that Risner attacked him with a knife, and that he only attacked

---

6. Speaks refers to his conviction for "aggravated assault" in both his second assignment of error and in the body of his brief. Speaks was not charged with or convicted of aggravated assault. This appears to be a typographical error. In its appellee's brief, the state commented on this obvious error. Nevertheless, in his reply brief, Speaks once again incorrectly refers to his conviction for "aggravated assault," rather than felonious assault. We caution Speaks' counsel to proofread the filings he submits to this court.

her in self-defense.

## 1. Legal Standard – Manifest Weight of the Evidence

{¶ 79} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 80} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

## 2. Self-Defense

{¶ 81} In a case involving use of non-deadly force,[7] an accused is justified in using force against another if (1) he was not at fault in creating the situation giving rise to the altercation and (2) he had reasonable grounds to believe and an honest belief, even though

---

7. The trial court provided the jurors an instruction on self-defense involving the use of non-deadly force. No issue has been raised by the parties concerning whether this was the appropriate instruction. We merely note that here.

- 21 -

mistaken, that he was in imminent danger of bodily harm and his only means to protect himself from the danger was by the use of force not likely to cause death or great bodily harm. *Clemmons*, 2020-Ohio-5394 at ¶ 22. The state must disprove only one of the elements of self-defense beyond a reasonable doubt in order to defeat a claim of self-defense. *State v. McFarland*, 12th Dist. Butler No. CA2021-05-053, 2022-Ohio-2326, ¶ 43, citing *State v. Byrd*, 12th Dist. Warren No. CA2019-07-073, 2020-Ohio-3073, ¶ 23, in turn citing *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

### 3. Analysis

{¶ 82} Speaks' sole argument concerning the issue of the state's burden on self-defense is that "Risner began the altercation at issue with Speaks." Speaks refers to his own testimony at trial claiming that after Risner arrived home she came running up the stairs with a knife and charged at him. In other words, Speaks is alleging that the weight of the evidence established that he was not at fault in creating the situation giving rise to the altercation.

{¶ 83} However, as discussed above, the state was only required to disprove *one* of three elements of self-defense in order to defeat Speaks' self-defense claim. *McFarland* at ¶ 43. Speaks has provided no argument whatsoever in this appeal on the issues of whether he lacked subjective and objective grounds to believe that he was in imminent danger of bodily harm, or that his only means to protect himself from the danger was by the use of force not likely to cause death or great bodily harm. His failure to argue these latter points is a concession that the state submitted evidence to prove one or both of these elements, either of which would defeat his self-defense claim and moot his second assignment of error.

{¶ 84} But even if Speaks had argued these points, we would find no merit to his argument that the state failed to disprove self-defense. Speaks' argument is essentially

that the jury failed to consider the version of events he presented in his recorded interview, or the version he testified to at trial (which, incidentally, were inconsistent with one another). He also highlights the fact that Risner possibly gave a positive response to Detective McDonald when he asked her, while she was in the hospital being prepared for air care transport to another hospital and unable to speak, whether she used a knife to defend herself.

{¶ 85} However, while Speaks cites his own testimony, he completely disregards Risner's testimony that Speaks dragged her up the stairs, her recollection of "lots of blood," and her unequivocal denial of using a knife against Speaks. He also disregards the crime scene photographs, which were inconsistent with any of the various versions of events he told investigators and at trial.

{¶ 86} Given the contradictory evidence presented at trial, the jury was in the best position to weigh the evidence and to judge Speaks' credibility. *State v. Merriweather*, 12th Dist. Butler No. CA2016-04-077, 2017-Ohio-421, ¶ 32. "It is * * * well-established that a conviction is not against the manifest weight of the evidence merely because the trier of fact believed the testimony of the state's witnesses." *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882, ¶ 13.

{¶ 87} Upon our review, it is plainly evident that Speaks' claim of self-defense was not believable and, furthermore, that Speaks lacked credibility. Speaks' versions of events changed repeatedly and were never consistent. In his first description of the incident, Speaks claimed that Risner came after him with a knife. He threw some unknown object at her, then grabbed the knife and threw it down the stairs. He then held Risner down. She managed to hit him again, which was when he "snapped," delivering the severe beating evident through the photographs and medical records.

{¶ 88} In the next version, relayed just a few minutes later, Speaks again claimed he

could not remember what he threw at Risner, but that he picked up the nearest object to him. After he held Risner down, she "reached for something," which he presumed was a weapon. This was when he started "wailing" on her.

{¶ 89} Speaks changed his story again when discussing the event on recorded jail phone calls. Now, the injuries on his hands, which the photographs quite obviously indicate were from Speaks punching Risner's face repeatedly, came from Risner "slashing" him with the knife. And now, the small kitchen knife, which he stated Risner used to cut carrots, had become a "butcher's knife." Furthermore, he now recalled that the object he threw at Risner was a pack of playing cards.

{¶ 90} The version of events he presented at trial was even more significantly changed. Speaks relayed, in dramatic detail, how Risner charged into the attic, brandishing a knife, and then sprinted at him with the knife. He threw a pack of "Magic: The Gathering" playing cards at her, which he happened to be holding in his hand (that is, he did not pick them up). He then described how the much shorter Risner came down on him, hacking with the knife, successfully cutting his hands several times. Also, in this version of events, he did not grab the knife and toss it, but instead lost track of its location, which was what justified his final "downward strike."

{¶ 91} Speaks generally came across as unbelievable during his attempts to explain his testimony and various statements. For example, when asked why he said that the knife Risner used against him was a "butcher knife," he claimed he believed it was a butcher knife. As to why he initially told Detective McDonald that it was a small knife (which it was), he offered that he was "concussed" and "shellshocked." He added that he could not see the knife when Risner attacked him due to the room being dark. And he explained that the room was dark because he had been asleep. But during direct examination, Speaks stated that he woke up earlier that afternoon, and that Risner entered the property while he was in

the process of packing up his items to leave.

{¶ 92} Looking past the many and obvious contradictions and problems with Speaks' multiple, ever-changing versions of events, Speaks' overall story was that Risner entered a confined space with a single exit, armed with a small kitchen knife. She then charged at a trained fighter who stood over a foot taller than her and outweighed her by approximately 100 pounds. And she did this because she was angry that he had not yet left her home. Speaks' story was simply not believable.

{¶ 93} The more likely scenario coincided with what Risner could remember of the incident, and with the photographs, the medical records, and the text exchange admitted into evidence. That more probable scenario was that Speaks was angry with Risner for evicting him from her home. At some point, he dragged her up the stairs to the attic and savagely beat the much smaller woman in various locations around the attic, as demonstrated by the extent of blood and blood splatter throughout the attic. And the evidence of significant blood staining on Speaks' shorts was consistent with the "ground and pound" MMA technique he described at trial.

{¶ 94} In sum, we do not find that the greater weight of the evidence established that Speaks acted in self-defense. The record supported the conclusion that Speaks was at fault for creating the situation that gave rise to the altercation. The physical evidence and Risner's testimony indicated that Speaks dragged Risner up the steps and beat her throughout the attic. And he, as a trained MMA fighter and much larger individual, lacked an objective or subjective belief that he was in danger of bodily harm from Risner, or that his only means to protect himself from Risner was by the use of force not likely to cause death or great bodily harm. To the contrary, he savagely beat Risner nearly to death, well beyond what was necessary to incapacitate her. As a result, she suffered severe, permanent, and debilitating injuries. For these reasons, we overrule Speaks' second

assignment of error.

### III. Conclusion

{¶ 95} Evidence related to Speaks' background in MMA fighting and training was relevant to legal and factual issues in the case and therefore the trial court did err in admitting that evidence.  The jury did not lose its way in finding that the state disproved his claim of self-defense.

{¶ 96}  Judgment affirmed.


S. POWELL, P.J., and PIPER, J., concur.