[Cite as *State v. Haley*, 2024-Ohio-2303.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

STATE OF OHIO, :

    Appellee, : CASE NO. CA2023-03-005

: O P I N I O N
- vs - 6/17/2024

:

PHILLIP T. HALEY, :

    Appellant. :

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 2022-5022

Andrew T. McCoy, Clinton County Prosecuting Attorney, and David Milender, Assistant Prosecuting Attorney, for appellee.

Kathleen Evans, Assistant State Public Defender, for appellant.

**BYRNE, J.**

{¶ 1} Phillip Haley appeals from his convictions for murder and felonious assault in the Clinton County Court of Common Pleas. For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

{¶ 2}    In February 2022, a Clinton County grand jury indicted Haley on six counts: (1) Count One, felonious assault (deadly weapon); (2) Count Two, murder (proximate result of committing a felony offense of violence); (3) Count Three, murder (with purpose); (4) Count Four, criminal trespass; (5) Count Five, aggravated murder (purposeful murder while committing criminal trespass); and (6) Count Six, aggravated murder (prior calculation and design).  All six counts included firearm specifications.

{¶ 3}    The indictment arose after Haley shot and killed the victim, Zachary Parrott ("Zach"), in Haley's home.  Before the shooting, Haley was estranged from his wife, Kari Haley ("Kari"), and living apart from his family.  But he was also spying on Kari using an internet-connected camera.  On the day of the shooting, he remotely observed Kari and Zach enter the family home.  Armed with a pistol, Haley drove to the home, initiated a fight with Zach, and then shot him dead.

{¶ 4}    The matter proceeded to a multiple-day jury trial.  The state introduced the testimony of numerous witnesses, as well as photographic and documentary evidence.  The below summarizes the witness testimony and evidence that is relevant to deciding this appeal.

### A.  Trial – State's Case

### 1. Kari Haley's Testimony

{¶ 5}    Kari testified that she had been married to Haley for 16 years and they had two daughters, ages 16 and 12.  Kari testified that on November 29, 2021, she received a concerning message from one of her daughters.  Because of this message, she immediately confronted Haley and asked him to leave their home at 6685 State Route 729 ("the home").

{¶ 6}    Haley agreed to her request and left.  According to Kari, Haley was not

supposed to be in the home when she and the daughters were present. Between November 29 and December 27, 2021, Haley was living in his truck. Haley was, however, allowed to come to the home "by appointment" when Kari and the daughters were not home.

{¶ 7} The home had two "Nest" internet-connected cameras installed in the home's carport. The cameras were positioned to capture images of any vehicle or person in the home's driveway and carport. The images or video could be accessed through an application on a cell phone ("Nest app").

{¶ 8} After Haley left the home on November 29, Kari unplugged the Nest cameras. She explained that she did not want Haley spying on her and their daughters. Between November 29 and December 27, she periodically checked to make sure the cameras were disconnected. She once found that the cameras had been reconnected without her knowledge. She disconnected them and told Haley not to plug the cameras back in.

{¶ 9} In late December, Kari made plans with Linda and Glenn Gilley—Haley's adoptive parents—to have the two daughters stay with the Gilleys the week following Christmas. Kari texted the Gilleys that she would drop the daughters off on December 27. Kari specifically asked the Gilleys not to tell Haley about these plans. But unbeknownst to Kari, Linda Gilley forwarded this information to Haley.

{¶ 10} On December 27, Kari dropped off the daughters with the Gilleys. That afternoon, she worked a shift at her job at Bath and Body Works. Zach was Kari's coworker at Bath and Body Works. She and Zach met when he began working at the store in October 2021. They and another coworker—Marianne— became friends. Kari, Zach, and Marianne would socialize outside of work, and they did so fairly often. They

would go out to eat or get a drink after work. Sometimes they would "hang out" at Zach's house with a couple of other friends. They would drink and play board games. Kari testified that there was no romantic relationship between Zach and her. Zach had a girlfriend.

{¶ 11} Kari, Zach, and Marianne made plans to have a board game night at Kari's home on December 27, after Kari dropped the daughters off with the Gilleys. They planned to play board games, watch videos, and listen to music. Music was a mutual interest of all three friends.

{¶ 12} Zach was also working at Bath and Body Works that day. After work ended, just before 8:00 p.m., Zach and Kari drove separately to Kari's home. Zach, who had never been to Kari's home before, followed her to the home in his vehicle. The drive was around 20 to 25 minutes. Marianne did not work with them that day, but Marianne planned to meet them at the home. When Kari and Zach arrived at the home, Marianne was not yet there.

{¶ 13} After arriving at the home, Kari showed Zach around, including showing him the upstairs guest bedroom. He changed out of his work clothes in the guest bedroom and Kari changed out of her work clothes in the master bedroom.

{¶ 14} Kari then asked Zach to come into the master bedroom because she wanted to show him her record player and some of her records. She put a record on. Zach sat on the bed and was asking her about a book she was reading, which he started to flip through.

{¶ 15} They were expecting Marianne to arrive at any moment and so it did not surprise Kari to hear her security system announce that the front door was open. She expected that it was Marianne. However, she heard someone quickly running up the stairs. She looked out of the bedroom door to see who it was and saw it was her husband,

Haley. She said, "oh shit." Haley responded, "oh shit is right." Haley entered the master bedroom and confronted Zach. Haley was aggressive and hostile. He yelled and screamed at Zach. He said things like, "what the fuck are you doing here. Why are you in my fucking house. Who the fuck are you?"

{¶ 16} Kari stated that while Haley was berating Zach, Zach never stood up or acted aggressively. Instead, he kept his calm and attempted to tell Haley that he and Kari were just friends, that they were just hanging out, and nothing was going on. But Zach's attempts to calm Haley failed. At one point, Haley grabbed the book that Zach was holding and threw it.

{¶ 17} Kari stated that she placed herself between Haley and Zach. She was concerned for Zach's safety. Haley barely acknowledged her presence, and was instead directing his attention towards Zach. When Zach realized that Haley was not going to calm down, he said, "it's fine, I'll leave."

{¶ 18} Zach then got up and walked out of the master bedroom to go to the guest bedroom to retrieve his bag. Haley continued to yell and scream at Zach, but he backed up to allow Zach out of the master bedroom. Kari continued to position herself between Haley and Zach. When Zach went into the guest bedroom, Haley saw that Zach had an overnight bag. This made Haley even more angry. He said, "you have a fucking bag?"

{¶ 19} Kari testified that everything occurred "very fast" after that. Haley threw a punch and, while Kari was not sure whether he was aiming for her or Zach, the punch landed on Kari's face.

{¶ 20} After being punched by Haley, Kari got out of the way and ran into the master bedroom to grab her phone. She intended to call 9-1-1 and wanted Haley to leave. Outside, Haley and Zach were fighting. Kari described them as fighting but "kind of like holding onto each other." They were moving around in the hallway outside the master

bedroom and they moved towards the bathroom. Zach's back was positioned towards the bathroom. The last thing Kari saw was Zach being backed into the bathroom by Haley, who was in front of him.

{¶ 21} After retrieving her phone, Kari walked back into the hallway. At the moment she entered the hallway, she heard two quick gunshots. She ran towards the bathroom. Haley was exiting the bathroom. According to Kari, Haley had a look on his face suggesting, "oh shit, what did I do?" Kari asked Haley, "what did you do?" Haley looked at her but said nothing. Haley then ran down the stairs and out the door.

{¶ 22} Kari ran into the bathroom and found Zach on the floor, shot. On a 9-1-1 call played at trial, dispatchers instructed Kari to perform CPR. Kari attempted life saving measures until first responders arrived.

{¶ 23} Kari testified that the time between when Haley punched her and the time she heard gunshots was short—maybe 15 seconds. Kari testified that Zach was never the aggressor in the situation. She was 100 percent certain that Haley threw the first punch and that Zach did nothing to provoke Haley. Kari testified that Haley started the fight that night.

**2. Series of Hallway Photographs**

{¶ 24} The state introduced a remarkable series of photographs that were found on Haley's cell phone, which the prosecutor reviewed with Kari during her testimony.[1]

{¶ 25} These photographs were shot by Haley using his cell phone in the hallway outside the guest bedroom. The photographs depict Kari and Zach in the moments before

---

1. The photographs were not found in any readily accessible photograph album on Haley's phone. Instead, the investigating detective found the photographs by using a computer program to download the contents of the entire phone, and individually reviewing over one hundred and fifty thousand images that were contained within the phone's memory. The photographs contained some data that suggested they were "modified" at 8:49 p.m. on December 27, 2021, which was approximately 10 minutes after the shooting. It is not clear from the trial record how the photographs were "modified" or whether this indicated that the photographs had been deleted.

Zach's death, when Zach was putting on his shoes and retrieving his overnight bag from the guest bedroom in an attempt to leave the home.

{¶ 26} The first photograph depicts Kari standing outside the guest bedroom with Zach in the background, in the guest bedroom. Zach is wearing socks but no shoes. Kari is looking up at Haley and has her arm extended out. Her posture is consistent with attempting to keep Haley separated from Zach.

{¶ 27} In the second photograph, Kari is no longer in the frame. The camera is centered on Zach, who is still in the guest bedroom. Zach appears to have already put a shoe on his right foot, and to be in the process of putting a shoe on his left foot.

{¶ 28} In the third photograph, Kari's blurred face is directed towards Haley. Behind Kari, Zach is looking in Haley's direction. Zach's only visible arm is down, not raised.

{¶ 29} In the fourth photograph, Kari's head is barely visible within the frame. The camera is focused on Zach. Zach has his arms down. Both of Zach's hands are extended outward, palms out, in a familiar gesture used when attempting to explain something to someone who is not listening. The expression on Zach's face is that of concern, or frustration. Zach appears non-threatening.

{¶ 30} In the fifth photograph, more of Kari's head is in the frame. She continues to stand in front of Zach, who is in the background. Zach appears to have moved into the doorway of the guest bedroom. His facial expression is one of confusion, or perhaps disbelief. His arms are down. Zach is holding his right palm upward in a pleading gesture. Zach appears non-threatening.

{¶ 31} In the sixth photograph, Kari remains in front of Haley, though most of her face is obscured. Kari and Zach appear to have moved further out into the hallway. Zach is visible behind Kari, and the photograph depicts his left arm, which is down. Zach is

holding his left hand out and towards the ground.  The reader would recognize this hand gesture as Zach attempting to communicate "calm down."

{¶ 32} The seventh photograph depicts Kari's arms on a banister in the hallway, and she appears to be continuing to attempt to keep Haley away from Zach.  Zach is barely visible in this photograph.  Zach's bag appears to be on the ground in this photograph.

{¶ 33} In the eighth photograph, Kari remains in the foreground.  Zach is in the background and has turned away from Haley.  He is leaning over his bag and appears to be picking it up.

{¶ 34} In the ninth photograph, Kari remains in the foreground, arm extended outwards, separating Haley from Zach.  Zach is behind Kari and he appears to be carrying his bag.

{¶ 35} In the tenth photograph, Kari is not in the frame.  Zach is much closer to the camera now.  The photographs only depict the edge of Zach's right arm.

{¶ 36} In the eleventh photograph, neither Kari nor Zach is in the frame.  The only visible object appears to be the leaves of a plant.

### 3. Haley's 9-1-1 Call

{¶ 37} The state introduced the recording of the 9-1-1 call placed by Haley after the shooting, at 8:38 p.m.  On it, Haley tells the dispatcher,

> I just used my firearm to defend my life, and I need help.  * * *
> There was a man in my house, and I asked him to leave.  He
> would not leave, and then he tried to hit me.  He tried to—he
> punched me in my face.  I told him to get out.  I told him I had
> a gun.  He wouldn't leave.  He kept hitting me.

{¶ 38} The dispatcher asked Haley if he shot the man.  Haley stated that he did.  Haley added that, "he chased me, and I just shot him."

**4. Marianne Rucker's Testimony**

{¶ 39} Marianne confirmed that she was coworkers and friends with Zach and Kari. She testified that Zach was not in a romantic relationship with either Kari or her.

{¶ 40} Marianne stated that on December 27, 2021, she drove over to Kari's house to meet up with Kari and Zach and play board games. She intended to spend the night because they all had to open the Bath and Body Works store the next day.

{¶ 41} Marianne estimated that she arrived at the home sometime between 8:30 and 8:45 p.m. She parked her car next to Zach's car. Before she got out of the vehicle, Haley knocked on the front of the hood of her car. He walked over to the driver-side window. He told her that there was a "dangerous situation" happening inside the home and that it was not safe for her to be there.

{¶ 42} Haley seemed very calm. There was nothing about his demeanor that set off any alarms to her other than him saying there was a dangerous situation. She thanked him and left.

{¶ 43} Marianne attempted to call Zach at 8:46 p.m. that evening. She also texted him, asking why Kari's "ex" told her to leave and that the police were on their way.

**5. Zach's Death, Haley's Arrest, and the Gun**

{¶ 44} First responders found Zach deceased when they arrived on scene. He had two gunshot wounds, one to the chest, and one to the stomach.

{¶ 45} Haley remained at the scene and complied with police commands when he was taken into custody. Haley had a black eye and some minor swelling around his eye. A firefighter/EMT testified that Haley refused to go to the hospital. The firefighter offered Haley an ice pack. Haley did not complain of losing consciousness.

{¶ 46} Law enforcement officers recovered a Glock 26 pistol and nine millimeter hollow point cartridges from Haley's vehicle. This was the gun and type of cartridges that

Haley used to shoot Zach.  Law enforcement also secured Haley's cell phone.

{¶ 47}  A sheriff's deputy testified as to the design of a hollow point bullet, which he stated was designed to cause more damage as it passed through a living object.  The deputy also stated that a hollow point bullet is designed to stay in the body rather than passing through the body.

### 6. Autopsy Findings

{¶ 48}  A forensic pathologist who worked for a coroner's office testified about his findings from Zach's autopsy.  The two gunshot wounds were both entrance wounds. There were no exit wounds.

{¶ 49}  The trajectory of the bullet that entered Zach's abdomen was straight front-to-back and around 15 degrees downward.  There was gun powder stippling around the abdomen wound indicating that Zach was within two feet of the gun when it was fired.

{¶ 50}  The trajectory of the bullet that entered Zach's chest was also straight front-to-back, but at more of a downward trajectory, around 45 degrees.  The pathologist opined that this trajectory was consistent with someone who is bent or falling over.  There was not as much gun powder stippling associated with this wound, indicating that the gun was fired farther away from Zach than was the case with the abdominal wound.

{¶ 51}  The pathologist opined that in the absence of any other injury, the abdomen shot was "very survivable."  That said, the shot to the chest passed through Zach's heart and lodged in his spine.  This was not a survivable injury.  It would have resulted in Zach being immediately paralyzed below the waist.  The pathologist stated, "he would just drop."

### 7. Lieutenant Douglas Eastes' Testimony

{¶ 52} Lieutenant Douglas Eastes, who worked in the detective section of the Clinton County Sheriff's Department, testified about his investigation into the

circumstances of Zach's death.  Detective Eastes confirmed that there were no weapons of any sort found in Zach's bag.

{¶ 53} Upon first inspecting the overall crime scene, Detective Eastes noticed the Nest cameras outside the home.  He asked Kari about these cameras.  She said that they were not functioning because she had disconnected them.  He investigated further and found that they were in fact connected to power.  He informed her of this, and her reaction was shock.  Kari tried to access the cameras on her Nest app.  But her password to access the Nest app no longer worked and she could not gain access to the cameras.

{¶ 54} During his investigation, Lieutenant Eastes obtained multiple search warrants designed to permit him to access the contents of Haley's cell phone and to establish a timeline of Haley's activities prior to, during, and after the shooting.  From his investigative efforts (which the trial record reveals were extensive), Lieutenant Eastes produced the following timeline of events relating to the use of Haley's cell phone on December 27, 2021:

- **2:24 a.m. –** An internet search was performed for "will a family member get notified that I removed them from Google home?"[2]

- **12:06 p.m. –** Linda Gilley texted Haley to inform him that she planned to pick up his daughters.  She also stated that she would send him "the text" as soon as she could.

- **12:55 p.m. –** Haley's mother texted Haley a screenshot of the text message she had received from Kari in which Kari shared her plans to drop the daughters off with the Gilleys on December 27 and asked them not to share that information with Haley.

- **Between 1:00 p.m. and 2:00 p.m. –** Haley was at the home.  He took photographs of the interior of the home.  In particular, he took a photograph of a Star Wars-themed article of clothing and a tray that appeared to contain

---

2. The Nest cameras and Nest app are Google products and this search was Haley exploring how to remove Kari from the Google account so that she would not be alerted that he reconnected the Nest cameras.

marijuana smoking paraphernalia.

- **Between 1:45 p.m. and 8:00 p.m. –** Haley repeatedly accessed the Nest app. He accessed the Nest app a total of 31 times that day.

- **8:05 p.m. –** Cell phone location data reveals that Haley's cell phone was near a Roosters restaurant in Wilmington, Ohio.

- **8:18 p.m. –** Haley opened the Nest app twice.

- **8:19 p.m. –** Haley saved a screenshot of the Nest app. The screenshot depicted two camera angles of a vehicle parked in the home's driveway. Minutes later, Haley saved a second screenshot of the Nest app, depicting the same vehicle.

- **8:21 p.m. –** Haley placed a 33-second call to his father, Glenn Gilley.

- **8:34 p.m. –** Haley was outside the home. He took a photograph of the license plate on Zach's vehicle.

- **8:38 p.m. –** Haley dialed 9-1-1 to report the shooting.

**{¶ 55}** Lieutenant Eastes testified that the distance between the Roosters restaurant and the home was 14 miles. Lieutenant Eastes drove the route and it took him 17 minutes and six seconds to make that trip driving at the speed limit.[3]

**{¶ 56}** Lieutenant Eastes testified that he reviewed recorded calls made by Haley in the county jail while Haley was awaiting trial. In the first of those calls, Haley spoke to his biological mother. He told her that he had been reading his Bible:

> Haley: I was reading Proverbs 6, and I got to verse 32, and then I read those next three verses, and I was like, okay, I'm done for the day. So I'm going to have to start asking [his father, Glenn Gilley] if there's, like, any other specific passages or anything else that I should look into because it

---

3. Approximately 15 minutes elapsed between the time that Haley took the Nest app screenshot of Zach's vehicle and when he took the photograph of Zach's vehicle's license plate. As discussed above and later in this opinion, Haley was at a Roosters restaurant that evening. Given that he had to walk out of the restaurant and get into his vehicle, the evidence suggests that Haley drove to the home at a very high rate of speed.

was, oh pretty deep.

Mother:  I'll have to look that up.

Haley:  Yeah.  It's obviously, you can decipher it for yourself.
I read the whole other following chapter, which included the
last two verses of chapter six, but man, I was, like, I gotta stop
reading this stuff because it was just, you know, it was bringing
it fresh in my mind, and I just don't want it to—I mean, it's going
to be there anyway obviously, but—

Mother:  Yeah.

{¶ 57} Lieutenant Eastes testified that Proverbs 6:32 involves an adulterous relationship with another man's wife, discusses how jealousy arouses a husband's fury, and states that the husband "will show no mercy when he takes his revenge."

{¶ 58} In another jail call, Haley stated that when he arrived at the home, it looked like Kari had just "got done fucking him," apparently referring to Zach.

**B. Trial – Defense's Case**

**1. Phillip Haley's Testimony**

{¶ 59} Haley testified at length concerning his background and training in the military.  He discussed his military record, including his deployments and various awards he received.  Haley served for over seven years in the Army.  He received an honorable discharge, which was also a medical discharge.  He was involved in a vehicle crash while serving and thus had degenerative disc disease.

{¶ 60} Haley testified that his back injury affected him daily and he had a very limited range of movement.  He suffered pain based on his level of physical activity.  He felt this pain on December 27, 2021.

{¶ 61} Haley agreed with Kari's testimony that he had been sleeping in his truck after leaving the home on November 29, 2021.  He explained he was doing this because there was an ongoing child protective services investigation and he was trying to "de-

escalate the situation," by which he meant that he did not want to cause any unnecessary problems until the matter could settle and be revisited with "calmer heads."

{¶ 62} Haley admitted reconnecting the two Nest cameras and further admitted to using the Nest app to monitor the home. He stated that he was concerned about a neighbor across the street.

{¶ 63} Haley admitted removing Kari from the Nest account. He explained that he did this because,

> I was, again, concerned about the neighbor across the street. And I believe at that time I had indication, I believe, that she was going to be home without the children. And I wanted to talk to her about our marriage.

{¶ 64} Haley admitted entering the home the afternoon of December 27. He also admitted taking photographs while he was there. He saw some marijuana smoking paraphernalia and some Star Wars clothing that he did not recognize. He stated that he took the photographs to protect himself in connection with the ongoing child protective services investigation.

{¶ 65} Haley testified that he got off work at 7:30 p.m. on December 27 and went to Roosters to eat. He arrived at Roosters just before 8:00 p.m. His plan was to eat and then wait for Kari to come home so that he could meet her there. His food had not yet arrived when he received a notification from the Nest app. When he opened the Nest app, he observed Kari and Zach entering the front door of the home. He left money on the table at Roosters and walked out.

{¶ 66} Haley testified that he did not recognize Zach. At the time, he claimed, he believed that Zach was a divorce lawyer. Kari had told him several times that she wanted a divorce. As to why he would believe that a divorce lawyer would be meeting with Kari at 8:00 p.m. at the home, Haley explained that he knew this was Kari's first time without

the children and he assumed she would be meeting with a lawyer.  He said that he hoped that Zach was a lawyer because "I didn't believe my wife would just bring anyone to our home."

{¶ 67}  Haley admitted losing his composure on the drive home.  He started to cry. He called Glenn Gilley and asked him if Kari had mentioned anything about wanting a divorce.  He stated that he drove only five miles over the speed limit, which was his usual practice.  Haley stated that he went to the home to "find out what the status of our marriage is."

{¶ 68}  Upon arriving at the home, Haley admitted taking the photograph of Zach's license plate.  He said that he did this because it was an unfamiliar vehicle and he wanted to make sure if he ever saw the vehicle again, he could verify that it was the same vehicle.

{¶ 69}  Haley entered the home and went up the stairs.  He stated he was "trying to hurry up the stairs."  As he was halfway up the stairs, he heard his bedroom doors open and saw movement.  It was Kari.  She was opening the doors and she looked at him and said, "oh shit."  He responded, "yep, oh shit, who's here?"

{¶ 70}  Haley noticed Zach sitting on the bed with a book on his lap.  Haley said, "who the fuck are you?"  Zach responded that he and Kari were just friends.  Haley replied, "if you are just friends, how come you are in my bedroom with my wife with the door shut?" Zach did not respond.  Haley told Zach to "get the fuck out of my house."  Zach again told him that he and Kari were just friends.  Haley reiterated his demand for Zach to leave the home.  Kari then left the room.  Kari did not state why she left the room, but she was frantic and appeared to be looking for "something."

{¶ 71}  Haley stated that Kari then came back into the bedroom and took the book from Zach's lap.  As she walked past Haley, he attempted to grab the book out of her hands and read the title.  Haley said, "what is this?"  Kari pulled the book away from him

and yelled that the book was hers. She then walked out of the bedroom and went towards what Haley called the "media room."

{¶ 72} Haley again told Zach to leave. Zach reiterated that he and Kari were just friends. Haley repeated his demand for Zach to leave and Zach repeated his statement that they were just friends. Then Haley stated, "don't make this escalate into something it doesn't need to, I will go get my gun." At that point, Zach threw up his hands and said "whatever, man." Then Zach stood up and walked out of the master bedroom and around the corner to the guest bedroom to get his "things."

{¶ 73} Haley admitted taking the series of photographs depicting Zach and Kari moments before the shooting. He stated that this was a "shutter" that he took with his cell phone. He said that he was attempting to record a video, but inadvertently took a "shutter," which he agreed was a "series of images that might be a fragment of a video."

{¶ 74} Haley explained his reason for attempting to record a video. He stated that once Kari returned from the "media room," he gave her his full attention. He asked her why she was doing "this" to him and he reminded her that they were still married. She responded, "No, we're not." So he took his cell phone out and asked her to say again that they were not married so that he could record that statement. She did not respond but gave him an "ugly look on her face and disapproval." Haley explained that his thought process behind recording her saying that they were not married was that such a statement would be useful to a divorce attorney. He stated that he was unaware at the time that Ohio is a no-fault divorce state.

{¶ 75} Haley denied that he was screaming when he was questioning Kari. He agreed that one of the photographs accurately depicted Zach putting on his shoes, but stated that Zach "never said he was going to leave. He just said, whatever, man, when he threw his hands up and got up and appeared to be leaving at the time." Haley stated

that he afforded Zach "every opportunity" to leave the home and had told him to leave the home three to four times at that point.

{¶ 76} Haley stated he put his cell phone away and told Kari to tell Zach to get his bag and leave the home. Haley announced, "I'm home now. I'm on vacation and I'm not going anywhere."

{¶ 77} Haley then took two steps towards the bathroom because Zach appeared to be coming out of the guest bedroom. Zach then stopped behind Kari and dropped his bag. It appeared to Haley that Zach did not intend to leave. Haley explained that after he stated he was not going anywhere, Zach had a confused look on his face and nodded his head in a manner reflecting disagreement.

{¶ 78} Haley then again yelled at Zach to leave but Zach did not move. Haley then told Zach, "you're either going to leave or I'm going to help you leave or I'm going to call the cops and they're going to make you leave." He added, "I'm not scared." Zach responded, "I'm not scared either."

{¶ 79} Haley then reached over Kari's shoulder to "usher" Zach out of the home. But Zach apparently anticipated this. Zach stepped to the right and punched Haley in his left eye. The punch was a "very good shot." It surprised Haley and was painful. Haley claimed the punch turned his eyelid inside out and his eye immediately began to water and bleed.

{¶ 80} Haley and Zach began fighting. They exchanged a few punches. Haley claimed that he was attempting to put distance between himself and Zach. He stepped backwards, towards the bathroom. Zach stepped forward, advancing on him. Haley's back was still to the bathroom. They both took several steps towards the bathroom and exchanged four or five punches each. Haley was blocking with his left hand and successfully landed two punches on Zach. Zach's punches landed on Haley in the same

- 17 -

place as before, just to the left of his eye.

{¶ 81} Haley said that he wanted to "address" his eye injury in the midst of the fight, so he pushed off Zach and took several steps backwards into the bathroom. Haley was adamant that he entered the bathroom first and said that Kari's claim that he pushed Zach into the bathroom was "false."

{¶ 82} Haley stepped into the bathroom doorway and flipped his eyelid back to normal. He also wanted to wipe water from his eye, so he lifted his shirt and used his shirt to wipe his eye. He believes that this was when Zach saw that he had a gun. Zach stepped forward and reached for the gun with his right hand. Haley swiped Zach's hand away, and at the same time, felt Zach's fingers "brush" the gun. This was when "things really got escalated."

{¶ 83} Haley explained that the light was off in the bathroom so it was difficult for him to see. He attempted to put distance between himself and Zach. He sidestepped to the right but his foot caught on the vanity and he tripped. He caught himself on the countertop.

{¶ 84} Zach then hit Haley in the left side of his face. Haley was experiencing shooting pain and it was hard for him to stand up. He felt dizzy and disoriented. Zach punched him four more times. Zach was swinging "wildly" with both his left and right fists. Haley was still blocking punches with his back against the wall of the bathroom when "[i]n one swift motion, I pulled out [the gun] and pulled the trigger twice."

{¶ 85} The shots were in very quick succession. Haley explained that this shooting method was what he was "trained" to do. By this he meant that the military trained him to shoot until a threat is eliminated.

{¶ 86} As soon as Haley fired the shots, Kari ran into the bathroom and turned on the light. She yelled, "what did you do?" Haley saw that Zach had a confused look on

his face.  Zach was moving his arms when Haley left.

{¶ 87}  Haley stated that it was a "very scary" situation when Zach tried to get his gun.  All he could think was that if Zach got his gun, Zach would use it against him.

{¶ 88}  After the shooting, Haley called Glenn Gilley and gave him a "brief rundown" of what had just occurred.  He then called his biological mother and did the same.

{¶ 89}  Haley stated that he suffered injuries other than the black eye and swelling.  He stated he had a ruptured ear drum and was almost knocked unconscious during the fight.  He explained that he did not go to the hospital because of "army tough guy syndrome" and because hospitals make him anxious.

{¶ 90}  On cross-examination, the state questioned Haley on his claims of being disabled.  The prosecutor played a video of Haley bench pressing 225 pounds in May 2019.  Haley further admitted that in the time after he left the home in November, he was holding himself out as a single person and was seeking other romantic relationships.

{¶ 91}  Haley agreed that Kari told him she did not want him watching what was going on at the home.  He agreed that he removed Kari from the Nest account to spy on her without her knowing.  He admitted that he did not call Kari to check on her as he was driving to the home on the evening of December 27, 2021.

### 2. Defense Expert's Testimony

{¶ 92}  The defense offered the report of its expert witness, also a pathologist, which essentially corroborated the state's pathologist findings.  The defense's pathologist added that due to the lack of any exit wounds, it would not be possible to reconstruct how Haley and Zach were positioned in the bathroom at the time of the shooting.

### C. The Verdict

{¶ 93}  The jury returned guilty verdicts on count one, felonious assault, with a firearm specification, and count two, murder, with a firearm specification.  The jury

returned not guilty verdicts on the remaining counts.

{¶ 94} The trial court merged counts one and two and the state elected to have the court sentence Haley on count two. The court sentenced Haley to a mandatory prison term of 18 years to life in prison. Haley appealed, raising two assignments of error.

## II. Law and Analysis

### A. Self-Defense

{¶ 95} Haley's first assignment of error states:

> PHILLIP HALEY'S CONVICTIONS WERE AGAINST THE
> MANIFEST WEIGHT OF THE EVIDENCE. FIFTH AND
> FOURTEENTH AMENDMENTS, U.S. CONSTITUTION;
> ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION.
> (T.PP. 674, 698-99, 731, 781-85, 793-94, 883).

{¶ 96} Haley contends that the jury verdicts on counts one and two were not supported by the manifest weight of the evidence because the state failed to meet its burden of proving that Haley did not act in self-defense when he shot and killed Zach.

### 1. Manifest Weight Standard of Review

{¶ 97} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 98} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and

determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App. 3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

## 2. State's Burden

{¶ 99} The jury convicted Haley of murder in violation of R.C. 2903.02(B) and felonious assault in violation of R.C. 2903.11(A)(2).

{¶ 100} For the offense of murder, the state was required to prove beyond a reasonable doubt that Haley "cause[d] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). The "offense of violence that is a felony of the first or second degree" from which death must proximately result was, in this case, felonious assault. R.C. 2903.11(D)(1)(a) (stating felonious assault is a felony of the second degree).

{¶ 101} For the offense of felonious assault, the state was required to prove beyond a reasonable doubt that Haley "[c]ause[d] or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

{¶ 102} Haley does not argue that the state failed to prove any element of murder under R.C. 2903.02(B) or felonious assault under R.C. 2903.11(A)(2). Instead, Haley contends that the state failed to meet its burden of proving that he did not act in self-defense.

{¶ 103} As to self-defense in cases involving the use of deadly force, we have explained that,

> In cases involving the use of deadly force, the elements of a valid claim of self-defense are (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) the accused did not violate any duty to retreat or avoid the danger.

*State v. Hubbard*, 12th Dist. Warren No. CA2023-01-014, 2024-Ohio-1315, ¶ 92, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), and *State v. Towson*, 12th Dist. Warren No. CA2021-08-069, 2022-Ohio-2096, ¶ 24.

{¶ 104} A statute, R.C. 2901.05(B)(1), provides that when "there is evidence presented that tends to support that the accused person used the force in self-defense * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." In other words, the state must disprove one of the aforementioned elements of self-defense beyond a reasonable doubt. *Hubbard* at ¶ 93, citing *State v. McFarland*, 12th Dist. Butler No. CA2021-05-053, 2022-Ohio-2326, ¶ 42.

{¶ 105} The self-defense elements and the state's burden can be confusing, because this is the rare situation when the General Assembly requires the state to *disprove* a fact or element. *McFarland* at ¶ 43. In *McFarland*, we restated the state's burden as follows:

> the state is required to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, or (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, or (3) violated a duty to retreat or avoid the danger. See *Byrd* at ¶ 23. The state need prove only one of these elements to disprove that a defendant acted in self-defense. *Id.*

*Id.* at ¶ 43.

{¶ 106} Given its verdict finding Haley guilty of murder and felonious assault and

rejecting Haley's self-defense argument, the jury must have concluded that the state disproved at least one of the three elements of self-defense.

### 3. Analysis of Self-Defense

{¶ 107} Haley argues that the jury lost its way to the extent it found that the state disproved (1) that he was at fault in creating the situation that led to the affray, (2) that he did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, or (3) that he violated a duty to retreat or avoid the danger.

### a. Not-At-Fault Element of Self-Defense

{¶ 108} "[T]he first element of a self-defense claim provides that the defendant must not be at fault in creating the situation that gave rise to the affray." *State v. Crawford*, 12th Dist. Clermont No. CA2023-04-022, 2024-Ohio-691, ¶ 26, citing *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 WL 126973, *9-10. This first element does not require in all situations that the defendant must have refrained from throwing the first punch; the concept is broader than simply not being the immediate aggressor. *Id.*, citing *Nichols* at *4, 10. "A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." *Id.*

{¶ 109} Haley acknowledges Kari's testimony that Haley threw the first punch. But Haley points to his own testimony that Zach punched him first. He argues that his version of events was supported by the physical evidence because Zach "did not have any signs of being punched in the face or head" whereas he suffered a black eye. He also points to his testimony that Zach followed him into the bathroom and continued the altercation. Finally, he cites the fact that Kari did not see what occurred in the bathroom.

{¶ 110} Given its verdict, the jury apparently disbelieved some or all of Haley's testimony and accepted the state's theory of the evidence, in whole or in part. This was

well within the jury's purview as the trier of fact and ultimate factfinder. *McFarland*, 2022-Ohio-2326 at ¶ 47, citing *State v. Simmons*, 12th Dist. Warren No. CA2020-10-069, 2021-Ohio-3563, ¶ 75; *see State v. Pittman*, 9th Dist. Summit No. 29705, 2021-Ohio-1051, ¶ 19 ("[t]he jury was free to find [the defendant's] testimony regarding self-defense not credible, and instead believe the state's version of the events"). "[T]he jury did not have to accept [the defendant's] claim of self-defense simply because he asserted the defense at trial." *Simmons* at ¶ 76, citing *State v. Moore*, 12th Dist. Fayette No. CA2020-09-016, 2021-Ohio-1856, ¶ 18; and *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85 ("[t]he fact that [the defendant] testified concerning his affirmative defense of self-defense does not mean that the jury had to believe him").

{¶ 111} After thoroughly reviewing the record, weighing inferences, and examining the credibility of witnesses, we find that the jury did not lose its way to the extent it found that Haley was the initial aggressor and at fault in creating the situation that gave rise to the affray. In fact, the evidence overwhelmingly suggested that Haley was the aggressor that evening.

{¶ 112} Kari testified that Haley came running up the stairs and immediately confronted Zach, screaming and yelling obscenities at him and demanding to know who he was. Kari testified that Zach never acted aggressively towards Haley and instead attempted to defuse the situation. When it became apparent that Haley was not going to calm down, Zach agreed to leave.

{¶ 113} Kari explained that after Haley observed Zach's overnight bag, he went into a deeper rage. Haley then actively blocked Zach from leaving by standing in the hallway. Haley then threw the first punch, which struck Kari, inadvertently or not. Afterward, Zach and Haley wrestled with one another, moving towards the bathroom. Only 15 seconds after Haley struck Kari, she heard the gunshots.

{¶ 114} The series of photographs of the incident taken by Haley corroborate Kari's testimony that Zach was not the aggressor that evening. Zach appears in those photographs to be attempting to leave—by putting on his shoes, and then grabbing his bag. The photographs depict him making non-aggressive, calming hand gestures.

{¶ 115} In sum, if the jurors believed Kari's testimony then they necessarily rejected Haley's testimony because it was so inconsistent with Kari's version of events, as well as the photographs Haley himself took.

{¶ 116} But jurors did not need to rely solely on Kari's testimony and the photographs to find that Haley was the initial aggressor. The state put forth evidence that in the 24 hours before the incident, Haley was spying on his wife using the Nest cameras, which he had reconnected against his wife's permission and without her knowledge. When he observed Zach's vehicle in his driveway and Zach and Kari entering the home, he immediately left the restaurant—before his food arrived—and drove very quickly to the home to confront Kari and the unknown individual. This behavior is consistent with Kari's testimony about Haley's aggressive behavior inside the home.

{¶ 117} There were many other reasons that the jurors might find Haley's testimony non-credible. Haley's claim that he believed his wife was meeting a divorce attorney was not believable. No reasonable person would assume that divorce attorneys make 8:00 p.m. house calls. But even if Kari had been meeting an attorney at such an hour, what purpose would it serve Haley to confront his wife at such a time? Would he be able to prevent a divorce by quickly arriving at the home?

{¶ 118} The more likely scenario, and the one more consistent with the evidence, is that Haley jealously believed that his estranged wife was having a dalliance with another man and he intended to confront this man. He drove to the house in a rage to catch his wife in the act of adultery. His failure to call Kari to alert her that he was coming

to the home and his act of rushing up the stairs corroborate this. And his recorded jail phone call with his biological mother, mere days after the shooting, effectively conceded this point.

{¶ 119} Furthermore, Haley's testimony that he was attempting to record his wife stating that they were not married lacked credibility when one examines the series of photographs. Haley claimed to be focused on his wife, speaking calmy to her during this time. Yet the focus of the camera's attention—and thus Haley's attention—was on Zach, not Kari. Kari is in the frame simply because she was blocking Haley's path to Zach.

{¶ 120} Next, Haley's explanation for why he removed Kari from the Nest app (supposedly so that they could talk about their marriage) was nonsensical. He claimed several times that Kari's testimony was false, despite other evidence corroborating Kari's testimony, including his own photographs. And notably, Haley claimed that Zach saw his gun and reached for it after he was in the bathroom, but Haley also stated that the bathroom was completely dark and he could barely see anything while defending himself.

{¶ 121} As mentioned above, Haley argues that the fact that Haley suffered a black eye while Zach did not have a black eye or other physical injuries (other than the gunshot wounds) suggests Haley acted in self-defense when struck by Zach. Not so. Given all the evidence, we think the fact that Haley had a black eye but Zach did not instead suggests that Haley simply did not land any punches on Zach in the fracas. In fact, Zach's lack of physical injuries supports Kari's description of Zach and Haley as fighting but "kind of like holding onto each other," and undermines Haley's assertion that he and Zach exchanged four or five punches each, as well as his assertion that he landed two punches on Zach.

{¶ 122} Simply put, the jurors did not lose their way in finding that Haley was the initial aggressor in the situation. The manifest weight of the evidence establishes that

Haley was the aggressor from the moment he entered the home. Because we have determined that the state met its burden of proof in disproving the first element of self-defense, we need not consider the other two elements. *See McFarland*, 2022-Ohio-2326 at ¶ 43. That said, we will now review the second and third elements of self-defense.

**b. Need-to-Use-Deadly-Force Element of Self-Defense**

{¶ 123} The second element of a self-defense claim provides that the defendant must have "a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape." *McFarland* at ¶ 43. The defendant's fear has an objective and subjective component. *State v. Russell*, 12th Dist. Warren Nos. CA2011-06-058 and CA2011-09-097, 2012-Ohio-1127, ¶ 34. The fear of death or great bodily harm must be objectively reasonable, meaning there must be reasonable objective grounds to believe that harm is imminent. *Id*. There also must be an honest subjective belief that great bodily harm or death is imminent. *Id*.

{¶ 124} Here, there was neither a reasonable objective nor subjective basis for Haley to believe he needed to use deadly force against Zach. The undisputed evidence was that Zach was not armed that evening. He had no guns, knives, or any other weapon. Instead, at best, he engaged in a fist fight with Haley—a fist fight started by Haley—although Kari described what the men were doing more as grappling with one another than as a fist fight.

{¶ 125} Even if we assume that Zach in fact gave Haley the black eye, this was a minor wound, which would not have justified Haley pulling out a gun and shooting Zach dead. The wound was so minor that Haley refused medical treatment for it on scene and instead accepted an ice pack. During his testimony, Haley tried to bolster his claim of being seriously injured in the fight, but this testimony was not convincing. Haley admitted he never sought any medical treatment for what occurred that evening.

{¶ 126} Haley claimed that Zach reached for his gun when he "addressed" his eye injury in the middle of the fight. But the jurors apparently did not find Haley credible in this regard. We defer to the jury on matters of witness credibility and nothing in the record would cause us to second-guess the jury's estimation of Haley's credibility. *State v. King*, 12th Dist. Clermont Nos. CA2022-01-002 and CA2022-01-003, 2023-Ohio-875, ¶ 42.

{¶ 127} We thus do not find that the jurors lost their way to the extent they concluded that Haley lacked a bona fide belief that he was in danger of great bodily harm or death. The manifest weight of the evidence establishes that Haley had no such bona fide belief. The state met its burden of proof in disproving the second element of self-defense.

### c. Duty to Retreat

{¶ 128} The third element of a self-defense claim provides that the defendant must not have "violated a duty to retreat or avoid the danger." *McFarland*, 2022-Ohio-2326 at ¶ 43. But we need not substantively review the third element because pursuant to R.C. 2901.09(B), there is no duty to retreat before using force in self-defense by a person who is in a place in which the person lawfully has a right to be. The jurors found Haley not guilty of trespassing, so they possibly concluded that he had a privilege to be at the home. Even if they did not, we have already concluded that the state proved that Haley was at fault and did not have a bona fide belief in the necessity to resort to deadly force. Therefore, he was not entitled to use deadly force in self-defense and whether he had a duty to retreat or not is an irrelevant consideration.

{¶ 129} For these reasons, we find that the state met its burden of proof in disproving that Haley acted in self-defense, and the jury's verdict was not against the manifest weight of the evidence. We overrule Haley's first assignment of error.

### B. Prosecutorial Misconduct

{¶ 130} Haley's second assignment of error states:

PHILLIP HALEY WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT THAT PLAINLY VIOLATED HIS CONSTITUTIONAL RIGHTS. CRIM.R. 52; FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. (T.PP. 341,435, 847, 924-25).

{¶ 131} Haley argues that the state committed prosecutorial misconduct in two instances during closing argument. We will review each allegation in turn after describing the applicable standard of review.

## 1. Standard of Review

{¶ 132} A court will find prosecutorial misconduct only when the conduct complained of was improper and prejudicially affected substantial rights of the defendant. *State v. Sanchez-Garza*, 12th Dist. Butler No. CA2016-02-036, 2017-Ohio-1234, ¶ 43, citing *State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, ¶ 58. The focus of an inquiry into allegations of prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Id*., citing *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. Therefore, a finding of prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial because of the prosecutor's prejudicial conduct. *Id.* citing *Layne* at ¶ 60. "The Constitution does not guarantee an 'error-free, perfect trial * * *.'" *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990), quoting *United States v. Hasting*, 461 U.S. 499, 508, 103 S.Ct. 1974 (1983).

## 2. Order of Shots Fired

{¶ 133} Haley argues that the prosecutor committed misconduct during closing argument when he told the jury that the state's pathologist and the defense's pathologist agreed that the shot to Zach's abdomen was the first shot fired. Haley contends that this was factually inaccurate because both the state and defense experts agreed that the

order of shots could not be determined based on the information available to them. Haley contends that the prosecutor compounded the problem by stating that if Haley had only fired the first shot (to the abdomen), then Zach would be in a wheelchair, testifying at trial. Haley contends that this remark about Zach being alive at trial was "highly inflammatory" because it bolstered the state's argument that Haley did not act in self-defense because he used excessive force.

{¶ 134} We have reviewed the record and Haley is correct that neither the state's pathologist nor the defense's expert specifically opined as to the order of gunshots. That said, that the stomach shot occurred first is a reasonable inference from the testimony of the state's pathologist. The state's pathologist stated that the chest shot was at a 45-degree downward angle, indicating that Zach was bending over or falling when he was shot. From this evidence, it is reasonable to infer that Zach may have been shot first in the stomach, causing him to bend over at the waist when he was shot a second time through the chest. Moreover, the defense expert agreed that the bullet trajectories through the body were consistent with movement by the victim between the shots.

{¶ 135} At any rate, we can perceive no prejudice here. Ultimately, the order of shots is irrelevant to the fact that Haley twice shot Zach and the state proved beyond a reasonable doubt that Haley was not entitled to claim self-defense. We see nothing "highly inflammatory" about the comment that Zach might have survived had he only been shot once in the stomach.

### 3. "Designed to Kill"

{¶ 136} Haley next complains that the prosecutor committed misconduct by asserting that the hollow point bullets he used in the shooting were "designed to kill." Haley argues that the detective who testified about the nature of hollow point bullets never specifically stated that they were "designed to kill" but rather that they were designed to

"stay in the body."  Haley argues that this comment was highly inflammatory.

{¶ 137}  We disagree.  The detective testified that a hollow point bullet is designed to "cause more damage as it passes through" and is further designed to "grab[] onto more organs, body tissue, bone, whatever it is that it's striking, and it causes more damage as it moves through.  It loses energy, and it's designed more to stay in the body. * * *  [T]he body absorbs all that energy, which ultimately causes more damage to whatever it struck, whether that's organs, the heart, the liver, the lungs, and the bones or anything else."

{¶ 138}  We can perceive no practical difference between stating that a bullet is designed to impact as many organs as possible while traveling through the body and stating that a bullet is "designed to kill."  The prosecutor's comment was fair based on the evidence presented at trial.  We overrule Haley's second assignment of error.

### III. Conclusion

{¶ 139} Haley's convictions were supported by the greater weight of the evidence as the state met its burden to prove Haley was not entitled to use deadly force in self-defense.  The state did not commit prosecutorial misconduct in closing argument, and even if it had done so, we find Haley was not prejudiced.

{¶ 140} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, JJ., concur.